EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Pueblo de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>Edgardo Arlequín Vélez<br><br>Recurrido | Certiorari<br><br>2020 TSPR 27<br><br>204 DPR \_\_\_\_ |

Número del Caso:  CC-2018-305


Fecha:  9 de marzo de 2020


Tribunal de Apelaciones:

    Región Judicial de Ponce, Panel VIII


Panel Sobre el Fiscal Independiente

    Lcdo. Guillermo Garau Díaz
    Fiscal Especial Independiente

    Lcdo. Ramón Mendoza Rosario
    Fiscal Delegado


Abogado de la parte recurrida:

    Lcdo. Carlos R. Padilla Montalvo


Materia: Derecho Penal - La concesión o aceptación de una conmutación de la pena condicional, no extingue los efectos jurídicos de una sentencia, por lo que puede apelarse dicha convicción criminal. Interpretación del término "beneficio" del Artículo 4.2(b) de la Ley de Ética Gubernamental.


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | | |
|---|---|---|---|
| El Pueblo de Puerto Rico | | | |
| Peticionario | | | |
| v. | | CC-2018-305 | *Certiorari* |
| Edgardo Arlequín Vélez | | | |
| Recurrido | | | |

Opinión del Tribunal emitida por el Juez Asociado SEÑOR FELIBERTI CINTRÓN.

En San Juan, Puerto Rico, a 9 de marzo de 2020.

El recurso que hoy consideramos es una continuación de nuestro dictamen en Pueblo v. Arlequín Vélez, 194 DPR 871 (2016) (*Sentencia*).[1] En esta ocasión nos corresponde, en primer lugar, determinar si la aceptación de una clemencia ejecutiva priva o no de jurisdicción al foro revisor para atender los méritos de un recurso en el que se cuestiona una convicción criminal. Adelantamos que, en el caso de autos, la aceptación de la clemencia ejecutiva en cuestión no privó al Tribunal de Apelaciones de su autoridad.

En segundo lugar, nos corresponde examinar si un servidor público que utiliza los deberes o las facultades de su cargo para intentar obtener cualquier beneficio no

---

[1] En Pueblo v. Arlequín Vélez, 194 DPR 871 (2016) (*Sentencia*) atendimos mediante el mecanismo de auxilio de jurisdicción una controversia de índole procesal relacionada a la fianza en apelación. Por el Tribunal estar igualmente dividido, se confirmó una *Resolución* dictada por el Tribunal de Apelaciones para concederle fianza en apelación al Sr. Edgardo Arlequín Vélez (señor Arlequín Vélez o exalcalde), quien en aquél entonces aún se desempeñaba como Alcalde del Municipio de Guayanilla (municipio).

permitido por ley (en este caso, acosar sexualmente a una subalterna con el propósito de proporcionarse un favor sexual no consentido), incurre en un abuso de poder constitutivo de la violación ética que establece el Artículo 4.2(b) de la Ley Orgánica de la Oficina de Ética Gubernamental de Puerto Rico, *infra*, con las sanciones penales que ello acarrea. Resolvemos que sí, por ser esa la interpretación más sensata y consecuente con la conducta tipificada y la intención legislativa del estatuto que rige la conducta ética de los servidores públicos. Veamos.

## I

Los hechos que originaron el caso de autos se remontan al mes de abril de 2015, cuando el Pueblo de Puerto Rico, representado por el Panel sobre el Fiscal Especial Independiente (PFEI), presentó varias denuncias contra el entonces Alcalde del Municipio de Guayanilla (municipio), el Sr. Edgardo Arlequín Vélez (señor Arlequín Vélez o exalcalde). La primera de ellas consistía en una denuncia por la comisión del **delito menos grave del Artículo 135** del Código Penal de Puerto Rico de 2012 (Código Penal), 33 LPRA sec. 5196, por incurrir en conducta constitutiva de **acoso sexual** hacia una subalterna. Del mismo modo, el PFEI presentó una acusación por **infracción ética al Artículo 4.2(b) de la Ley Orgánica de la Oficina de Ética Gubernamental de Puerto Rico** (Ley de Ética Gubernamental),

3 LPRA sec. 1857a(b),**2** el cual, en síntesis, prohíbe que los servidores públicos utilicen los deberes y facultades de su cargo para obtener cualquier beneficio no permitido por ley.

El juicio comenzó el 8 de octubre de 2015 y las vistas de presentación de prueba se extendieron hasta el mes de diciembre. Éstas incluyeron la presentación de múltiples testigos y piezas de prueba documental. Testificaron durante el procedimiento criminal, entre otras personas y funcionarias, la Sra. Lumari Torres Pérez (señora Torres Pérez o la empleada) quien al momento de los hechos ocupaba un puesto de carrera como Subdirectora de la Oficina de Programas Federales (Programas Federales) del municipio y la Sra. Enid V. Vargas Colón (señora Vargas Colón), Subdirectora de Recursos Humanos del municipio.

Culminado el juicio en su fondo en diciembre de 2015, el exalcalde presentó una *Moción en solicitud de*

---

**2** Recientemente se aprobó el Código anticorrupción para el nuevo Puerto Rico, Ley Núm. 2-2018. De su Exposición de Motivos surge que el estatuto aspira, entre otros aspectos, a elevar a rango de ley la cooperación interagencial para prevenir, combatir y erradicar la corrupción. Cataloga la corrupción gubernamental como un problema serio y delicado que socaba la confianza en las instituciones. Indica, además, que el acto de corrupción más frecuente es "el uso indebido del poder público para conseguir una ventaja ilegítima, generalmente de forma secreta y privada". Entre otros tipos de corrupción, enumera como uno de los más comunes la modalidad de *quid pro quo*. Al mismo tiempo, enmienda varias disposiciones de la anteriormente denominada Ley de Ética Gubernamental de Puerto Rico de 2011, para, entre otros asuntos, cambiar su título a Ley Orgánica de la Oficina de Ética Gubernamental de Puerto Rico (Ley de Ética Gubernamental), e indicar que la conducta de los servidores y exservidores públicos de la Rama Ejecutiva se regiría por dicha ley. Arts. 2.1-2.2, Ley Núm. 2-2018. Del mismo modo, el estatuto inhabilita para contratar o licitar con cualquier agencia ejecutiva del gobierno a toda persona convicta por, entre otras disposiciones, el Artículo 4.2 de la Ley de Ética Gubernamental, 3 LPRA sec. 1857a, y, asimismo, la incluye en el recién creado "Registro de personas convictas por corrupción". Arts. 3.4, 6.2, Ley Núm. 2-2018.

*desestimación    y    [para]    que    se    determine    la inconstitucionalidad del Artículo 4.2(b) de la Ley de Ética Gubernamental.* Argumentó, en lo pertinente, que el Artículo 4.2(b) de la Ley de Ética Gubernamental "adolece de vaguedad absoluta, por lo que resulta en uno inconstitucional de acuerdo [con] nuestro ordenamiento jurídico y al Derecho Penal en Puerto Rico".

En cumplimiento de orden, el PFEI presentó su oposición. En lo pertinente, alegó lo siguiente:

> En el caso que nos ocupa es esencial que se tome en consideración que el artículo 4.2 (b) pertenece, vive, en una ley de carácter especial. De esta manera lo que se requiere esencialmente para la validez del artículo en particular es que advierta la conducta prohibida y viabilice la intención legislativa en el desempeño de la función pública. Debe considerarse por igual que el artículo 4.2 (b) se dirige específicamente a un autor de delito que es un funcionario público. De esta manera no basta con alegar "vaguedad" partiendo de la premisa exclusiva de una persona ordinaria. Quien único puede cometer este delito es un funcionario público. La intención legislativa al establecer este artículo era prohibir precisamente la corrupción y abuso de poder de funcionarios públicos. En el caso específico de los funcionarios públicos estos reciben adiestramiento y orientación precisamente sobre la Ley de Ética Gubernamental, entre otras normas aplicables a sus deberes y responsabilidades.

Así el trámite, el 17 de diciembre de 2015, el Tribunal de Primera Instancia **declaró *no ha lugar* la solicitud de desestimación del exalcalde y emitió dos sentencias, mediante las cuales lo halló culpable por el delito de acoso sexual del Artículo 135 del Código Penal y por violación al Artículo 4.2(b) de la Ley de Ética**

**Gubernamental**. Asimismo, sentenció al exalcalde a cumplir de forma concurrente seis (6) meses de reclusión por el delito de acoso sexual y cuatro (4) años de cárcel por la violación ética.

Al día siguiente, el exalcalde presentó una moción de reconsideración. Luego de examinar la oposición del PFEI, el foro primario denegó la moción de reconsideración en corte abierta.

Insatisfecho, el exalcalde acudió al Tribunal de Apelaciones. Tras varios trámites,[3] argumentó que el foro primario erró al declararlo culpable. En la alternativa, adujo que el tribunal también incidió al negarle la opción de cumplir la sentencia impuesta mediante restricción domiciliaria y no declarar el Artículo 4.2(b) de la Ley de Ética Gubernamental inconstitucional de su faz. Planteó, además, que no se presentó prueba de los elementos del delito tipificado en el mencionado artículo y no se estableció su culpabilidad más allá de duda razonable.

---

[3] El exalcalde acudió ante el foro apelativo intermedio mediante un *Escrito de Apelación*. Conjuntamente, presentó una moción de fianza en apelación ante el Tribunal de Primera Instancia. Oportunamente, el PFEI se opuso a esa petición de fianza y el foro primario la denegó. Consecuentemente, el señor Arlequín Vélez sometió similar petición de fianza, esta vez con carácter de urgencia ante el Tribunal de Apelaciones. Este foro se la concedió, y, como mencionáramos anteriormente, ese dictamen quedó en vigor. Véanse Pueblo v. Arlequín Vélez, *supra*; *Escrito de Apelación* ante el Tribunal de Apelaciones, KLAN 201501958, Apéndice, págs. 76-79.

Posteriormente, el exalcalde argumentó que la *primera apelación* era prematura y anunció la presentación de otro *Escrito de Apelación*, idéntico al primero. El Tribunal de Apelaciones emitió una resolución consolidando ambos escritos de apelación. Véanse *Petición de Certiorari* presentada ante este Tribunal en el caso CC-2016-0050, Apéndice, págs. 75-77; *Escrito de Apelación* ante el Tribunal de Apelaciones, KLAN201600021, Apéndice, págs. 81-84; *Resolución* del foro apelativo intermedio, Apéndice, págs. 85-86.

Tras múltiples trámites procesales, el foro apelativo intermedio advino en conocimiento de que el entonces Gobernador de Puerto Rico, Hon. Alejandro J. García Padilla, le otorgó una clemencia ejecutiva al exalcalde. Por cuanto, le ordenó a este último que presentara copia del referido documento e informara si su concesión y aceptación afectaba la jurisdicción de dicho foro.

En enero de 2017, el PFEI presentó un *Escrito solicitando la desestimación del recurso* ante el foro apelativo intermedio por haberse tornado académico. Alegó, en resumen, que dicho foro perdió su jurisdicción para atender los méritos del recurso cuando el exalcalde aceptó la clemencia ejecutiva en su modalidad de "indulto condicional". El PFEI acompañó su escrito con copia de la clemencia ejecutiva y la aceptación del exalcalde.[4]

Por su parte, el exalcalde se opuso y argumentó que la clemencia otorgada no afectaba la jurisdicción del tribunal para atender su apelación. Fundamentó su posición en que, por ser un "indulto condicional", no quedaban eliminados los efectos de la sentencia. Ello, dado que no extinguía la pena impuesta la cual se mantenía con toda su fuerza y vigor, y tampoco se borraba la convicción de su récord penal. Añadió que, en la eventualidad de que el "indulto" quedara revocado por cualquier razón, vendría obligado a cumplir la sentencia.

---

[4] El *Indulto Núm. 55-2016* fue emitido el 22 de diciembre de 2016 y notificado el 11 de enero de 2017. Este documento se transcribe y examina detenidamente en la Parte III de esta *Opinión*.

A base de lo anterior, sostuvo que se le debía permitir cuestionar la corrección de las sentencias emitidas.

Así las cosas, el foro apelativo intermedio ordenó a la Oficina del Procurador General (Procurador General) a comparecer como amigo de la corte. Específicamente, prescribió que éste debía expresarse en torno a los efectos de la clemencia ejecutiva concedida.

El Procurador General cumplió con la orden y explicó que, aunque el entonces Gobernador le concedió al exalcalde "una clase de clemencia ejecutiva, la cual llamó 'indulto condicional'", se trataba más bien de una conmutación de la pena para modificarla de reclusión carcelaria a arresto domiciliario con monitoreo electrónico. Añadió que ésta establecía como requisito para su aplicación el cumplimiento con varias condiciones las cuales estarían vigente por el término total de la sentencia impuesta.

Transcurridas varias incidencias, el 26 de septiembre de 2017 el Tribunal de Apelaciones emitió una *Sentencia*. Como cuestión preliminar, adoptó la posición del Procurador General y concluyó que tenía jurisdicción para atender los méritos de la apelación. Entendió que, a pesar de la conmutación de la sentencia, la apelación presentaba una controversia "'genuina y viva' entre el Estado y el [exalcalde], cuya resolución afectar[ía] sus

relaciones jurídicas".[5]  Añadió que el hecho de que el exalcalde aceptara la referida conmutación no implicó una renuncia tácita a su derecho a apelar.

Acto seguido, el Tribunal de Apelaciones confirmó el fallo de culpabilidad y la sentencia por el delito de acoso sexual.  Concluyó que no existía razón para intervenir con la apreciación de la prueba realizada por el juzgador.  No obstante, el foro apelativo intermedio limitó la confirmación de la condena por el **delito de acoso sexual sólo "en su modalidad de ambiente hostil".** (Énfasis nuestro).

Por otra parte, el Tribunal de Apelaciones **revocó el fallo de culpabilidad por la infracción al Artículo 4.2(b) de la Ley de Ética Gubernamental.**  Razonó que la interpretación del término "beneficio", según consignado en el estatuto, no podía comprender "beneficios de carácter abstracto, es decir, beneficios de índole

---

[5]  El foro apelativo intermedio razonó que rechazar la posición del exalcalde tendría consecuencias colaterales en su futuro.  Al respecto, mencionó que:

> Por ejemplo, la condena por el delito de la Ley de Ética aquí en controversia (Artículo 4.2) inhabilita, de ordinario, al convicto de desempeñar cualquier cargo o empleo público. 3 LPRA sec. 1857f; Artículo 6.3(1)(e) de la Ley 8-2017 (requiriendo, como regla general, que todo "candidato que interese ingresar al servicio público deberá cumplir las siguientes condiciones generales: [...] no haber sido convicto por delito grave o por cualquier delito que implique depravación moral"). De forma similar, para aspirar a un cargo público electivo, se requiere que la persona no haya sido convicta de "delito grave o menos grave que implique depravación moral" y que se someta una declaración jurada de que no ha sido convicta por estos delitos en otras jurisdicciones. Ley 78-2011, 16 LPRA 4111(b)(6).

*Sentencia* del Tribunal de Apelaciones, esc. 3, pág. 7, Apéndice, pág. 9.

emocional, sentimental, espiritual, mental, síquico, estético o de similar clase". Entendió que la referida disposición sí comprendía "aquello a lo cual, de algún modo, puede adscribirse algún valor monetario en el mercado, así como, concebiblemente, algunas ventajas con un valor concreto y objetivo, aunque sean de difícil estimación monetaria".

Por último, el foro apelativo intermedio indicó, en la alternativa, que de entenderse que intentar obtener un favor sexual constituye un beneficio, no había prueba suficiente para que el juzgador de los hechos concluyera, más allá de duda razonable, que el exalcalde utilizó los deberes y facultades de su cargo para procurarse un beneficio prohibido por ley. Concretamente, expresó que "como cuestión de derecho, no se 'utiliza' el cargo simplemente porque el funcionario tenga 'acceso' al subalterno por virtud de su puesto; es necesario algo más —que se utilice algún poder o facultad del cargo en conexión con un intento de obtener el beneficio no permitido por ley".

En desacuerdo con lo resuelto por el Tribunal de Apelaciones, el PFEI presentó una *Moción de reconsideración*. Enumeró múltiples actuaciones del señor Arlequín Vélez como ejemplos probados por el foro sentenciador de corrupción gubernamental que denotaron la utilización del poder que le confirió su puesto para

obtener ventajas concretas y objetivas no permitidas por ley.

El Tribunal de Apelaciones, por votación mayoritaria de los Jueces Sánchez Ramos y Bermúdez Torres, emitió una *Resolución* extensa declinando alterar su dictamen. Por su parte, la Juez Ortiz Flores expresó que reconsideraría.

Insatisfecho, el 16 de marzo de 2018, el PFEI presentó ante este Tribunal la presente *Petición de Certiorari*. En esencia, cuestionó la determinación del foro apelativo intermedio de asumir jurisdicción, luego de que el exalcalde aceptara la clemencia ejecutiva, y, además, de revocar la decisión del foro primario que encontró probada la violación ética más allá de duda razonable. Específicamente, el PFEI señaló estos errores:

> PRIMER ERROR: Incidió el Honorable [Tribunal de Apelaciones] al no desestimar el recurso por carecer de jurisdicción para entender en los méritos de la apelación. Ello, porque el recurrido al aceptar la clemencia ejecutiva en su modalidad de indulto condicional que le concedió el entonces gobernador, tornó el caso en académico.
>
> SEGUNDO ERROR: Incidió el Honorable [Tribunal de Apelaciones] al concluir que la conducta imputada del ex convicto Edgardo Arlequín Vélez no está comprendida dentro de la prohibición del Artículo 4.2(b) de la Ley de Ética Gubernamental del 2011 y revocar la Sentencia y convicción por este delito que dictó el [Tribunal de Primera Instancia].
>
> TERCER ERROR: Incidió el Honorable [Tribunal de Apelaciones] al concluir que el Ministerio Público no probó más allá de duda razonable la violación al Artículo 4.2(b) de la Ley de Ética Gubernamental, y revocar la

Sentencia del ex convicto Edgardo Arlequín Vélez.

Expedido el recurso y con el beneficio de los alegatos de las partes, procedemos a atender las controversias ante nuestra consideración.

## II

Por ser una cuestión de umbral, inicialmente debemos examinar si el Tribunal de Apelaciones contaba con jurisdicción para atender en sus méritos el recurso apelativo presentado por el exalcalde o si, por el contrario, renunció a su derecho a apelar y, por ende, el caso se tornó académico cuando éste aceptó "la clemencia ejecutiva en su modalidad de indulto condicional". Para alcanzar una determinación, es menester analizar los orígenes y efectos de los distintos tipos de clemencia ejecutiva o perdones, con especial atención a los indultos y las conmutaciones de sentencias, condicionales o no. Como adelantamos previamente, en el presente caso la aceptación de la clemencia ejecutiva concedida no tuvo el efecto de privar al foro apelativo intermedio de su autoridad adjudicadora. Veamos.

### A. Clemencia ejecutiva

El Artículo II, Sección 2, Cláusula 1 de la Constitución de los Estados Unidos de América otorga al Presidente el poder plenario para suspender la ejecución de sentencias y conceder indultos por ofensas cometidas en contra de los Estados Unidos, excepto en casos de residencia. La disposición constitucional específicamente

lee: "The President shall […] have Power to grant Reprieves and Pardons for Offenses against the United States, except in Cases of Impeachment." Art. II, Sec. 2, Cl. 1, Const. EE. UU., LPRA, Tomo 1; Schick v. Reed, 419 US 256, 260 (1974).

La norma prevaleciente, según reiterada por el Tribunal Supremo de los Estados Unidos, establece que la clemencia ejecutiva o perdón constituye un acto de gracia procedente del poder para ejecutar las leyes, mediante el cual se exime al beneficiario de cumplir la pena impuesta por un crimen cometido en violación de ley. United States v. Wilson, 32 US 150, 160 (1833) ("A pardon is an act of grace, proceeding from the power intrusted with the execution of the laws, which exempts the individual, on whom it is bestowed, from the punishment the law inflicts for a crime he has committed […]"). A nivel federal el poder para conceder clemencias ejecutivas o perdones es amplio e incluye la facultad para otorgarlos condicionados al cumplimiento de ciertos requisitos. Ex parte Wells, 59 US 307, 314 (1855).

Por otra parte, aunque la Constitución de los Estados Unidos no reconoce expresamente el poder del Presidente para conmutar sentencias, al interpretar la referida disposición constitucional, el Tribunal Supremo federal ha establecido que el mismo está subsumido en el poder general para conceder perdones. Al respecto, detalló lo siguiente:

> We see, therefore, that the draftsmen of Art. II, s 2, spoke in terms of a 'prerogative' of the President, which ought not be 'fettered or embarrassed.' In light of the English common law from which such language was drawn, **the conclusion is inescapable that the pardoning power was intended to include the power to commute sentences on conditions which do not in themselves offend the Constitution, but which are not specifically provided for by statute.**
>
> .   .   .   .   .   .   .   .
>
> **In other words, this Court has long read the Constitution as authorizing the President to deal with individual cases by granting conditional pardons. The very essence of the pardoning power is to treat each case individually.**
>
> .   .   .   .   .   .   .   .
>
> […] **Additionally, considerations of public policy and humanitarian impulses support an interpretation of that power so as to permit the attachment of any condition which does not otherwise offend the Constitution. The plain purpose of the broad power conferred by s 2, cl. 1, was to allow plenary authority in the President to 'forgive' the convicted person in part or entirely, to reduce a penalty in terms of a specified number of years, or to alter it with conditions which are in themselves constitutionally unobjectionable.** (Énfasis suplido). <u>Schick v. Reed</u>, *supra*, págs. 263-266.

De manera ilustrativa, observamos que en otras jurisdicciones federales y estatales se han validado instancias en las cuales el Poder Ejecutivo ha concedido conmutaciones de sentencias condicionales, siempre que las restricciones impuestas no sean ilegales, inmorales, prohibidas por ley o imposibles de cumplir.[6] Conforme a

---

[6] 67A <u>CJS Pardon & Parole</u> Sec. 15 (actualizado en el 2019).

ello, algunas de las condiciones que se han sostenido como adecuadas son:  que el liberado pierda la conmutación por incurrir en mala conducta;[7] que éste se someta al control y supervisión de la junta administrativa de libertad condicional;[8] y que obedezca las leyes federales, estatales y ordenanzas municipales.[9]

A nivel local, el Artículo IV, Sección 4 de la Constitución de Puerto Rico también le reconoce al Gobernador el poder de conceder clemencias ejecutivas. Describe dicha facultad como una atribución para "[s]uspender la ejecución de sentencias en casos criminales, conceder indultos, **conmutar penas** y condonar total o parcialmente multas y confiscaciones por delitos cometidos en violación de las leyes de Puerto Rico[,] [excepto que dicha] facultad no se extiende a procesos de residencia". (Énfasis nuestro).  Art. IV, Sec. 4, Const. PR, LPRA, Tomo 1.

Amparado en la normativa federal, este Tribunal ha manifestado que la facultad de otorgar clemencias ejecutivas es una prerrogativa exclusiva del poder ejecutivo, cuyo poder dimana de la ley fundamental del Estado, y a la cual accede el acusado, no como parte de derecho alguno que le sea reconocido por el orden jurídico

---

[7]  Lupo v. Zerbst, 92 F.2d 362 (5to Cir. 1937); People ex rel. Marks v. Brophy, 58 N.E.2d 497 (1944); Guy v. Utecht, 12 N.W.2d 753 (1943).

[8]  People ex rel. Tyrian v. Adam, 74 N.Y.S.2d 57, 63 (Sup. Ct. 1947).

[9]  Ricks v. State, 882 S.W.2d 387 (Tenn. Crim. App. 1994).

vigente, sino mediante la concesión de una gracia otorgada por el Gobernador. <u>Reynolds v. Jefe Penitenciaría</u>, 91 DPR 303, 313 (1964); <u>Pueblo v. Albizu</u>, 77 DPR 888, 893 (1955); <u>Emanuelli v. Tribl. de Distrito</u>, 74 DPR 541, 548 (1953).

En <u>Downs v. Porrata, Fiscal</u>, 76 DPR 611 (1954), hicimos un recuento histórico de la figura de la clemencia ejecutiva y concluimos que el texto de la Constitución de Puerto Rico contiene los conceptos tradicionalmente utilizados por la jurisprudencia clásica federal al interpretar la Constitución de los Estados Unidos. A esos efectos, reconocimos que:

.    .    .    .    .    .    .    .

> La anatomía jurídica [del Artículo IV, Sección 4 de la Constitución de Puerto Rico] nos lleva de la mano a concluir que estamos frente a uno de los pocos poderes del monarca que reconoce la democracia. Por analogía, el escueto poder constitucional conferido por la Sec. 2 del Artículo II de la Constitución al Presidente de los Estados Unidos de América, concediéndole 'poder para suspender la ejecución de sentencias o conceder indultos por crímenes contra los Estados Unidos, excepto en casos de residencia', fu[e] enriquecido por la significación tradicional de la prerrogativa real de la corona inglesa, ya que, 'ejercida desde tiempo inmemorial por el ejecutivo de esa nación cuyo idioma es nuestro idioma y con cuyas instituciones judiciales las nuestras guardan una estrecha semejanza, adoptamos sus principios en cuanto al modo (*operation*) y efecto de un indulto e indagaremos en sus textos aquellas reglas que establecen la manera (*manner*) en que la gracia debe ser usada por la persona a quien le incumba'[.] […]

.    .    .    .    .    .    .    .

> Basta examinar el Artículo IV, Sec. [4] de la Constitución […] de Puerto Rico para darnos cuenta que todas y cada una de las palabras que contiene dicho artículo son los conceptos tradicionales esclarecidos por la jurisprudencia clásica. […] (Citas omitidas). <u>Downs v. Porrata, Fiscal</u>, *supra*, págs. 614-617.

Subsiguientemente, en <u>Reynolds v. Jefe Penitenciaría</u>, *supra*, recalcamos que la clemencia ejecutiva es una gracia del Gobernador y que éste podrá imponer las condiciones que así desee, siempre que no sean contrarias a la ley, la moral o sean imposibles de cumplir. <u>Íd.</u>, pág. 313. Como fundamento, adoptamos las palabras del Juez Holmes del Tribunal Supremo federal, quien en representación del Pleno de dicho Foro expresó que:

> Un indulto en nuestros días no es un acto de gracia privado de un individuo en posesión de ese poder. Es parte del plan constitucional. Cuando se concede constituye la determinación de la autoridad máxima de que el bienestar público quedará mejor servido imponiendo menos que lo fijado en la sentencia. (Citas omitidas). <u>Íd.</u>, pág. 314 (citando a <u>Biddle v. Perovich</u>, 274 US 480, 486 (1927)).

## B. Efectos de la concesión y aceptación de una clemencia ejecutiva

En cuanto a los efectos de la concesión y aceptación de clemencias ejecutivas o perdones, el Tribunal Supremo federal resolvió hace más de un siglo y medio que el indulto absoluto absuelve al infractor de todas las consecuencias, directas o colaterales, de los delitos cometidos y, por ende, de la convicción; quedando éste liberado de cualquier castigo. *Ex parte* <u>Garland</u>, 71 US

333, 342 (1866) ("The effect of a full pardon is to absolve the party from all the consequences of his crime, and of his conviction therefor, direct and collateral; it frees him from the punishment, whether of imprisonment, pecuniary penalty, or whatever else the law has provided."). Véase, además, O. E. Resumil de Sanfilippo, *Derecho Procesal Penal*, New Hampshire, Ed. Butterworth Legal Publisher, 1993, T. 2, págs. 210-211.

Cónsono con la norma anterior, en Emanuelli v. Tribl. de Distrito, *supra*, manifestamos que "[e]l indulto borra para siempre la convicción del delito cometido, quedando de ahí en adelante el indultado tan limpio de ella como si nunca hubiera sido convicto". Íd., pág. 548; Resumil de Sanfilippo, *supra*.

En Pueblo v. Albizu, *supra*, este Tribunal interpretó por primera vez el alcance de un acto de clemencia ejecutiva mediante el cual se concedió un indulto condicional, que podía ser revocado en la eventualidad de que se cometieran nuevas infracciones de ley. Íd., pág. 896. En esa ocasión, el acusado fue convicto por infracciones a las leyes de Puerto Rico y sentenciado a cumplir varios años de cárcel. Íd., pág. 890. Luego, el confinado apeló la sentencia dentro del término hábil. Tiempo después, estando aún pendiente el perfeccionamiento del recurso apelativo, recibió un indulto por parte del Gobernador. Entre tanto, vencida una prórroga otorgada al confinado, el Fiscal solicitó a este Tribunal que se

desestimara el recurso de apelación por no haberse perfeccionado y estar en completo estado de abandono. El confinado justificó su dilación, entre otras razones, porque entendió que el Gobernador le había concedido un indulto absoluto, razón por la cual no venía obligado a perfeccionar su recurso apelativo. Adujo, ante estas circunstancias, que meramente procedía archivar y sobreseer todas las causas objeto del indulto. Íd., pág. 891.

En aquel momento, examinamos el texto de la clemencia ejecutiva en cuestión y determinamos que se trataba de un indulto condicional, no absoluto, debido a que el incumplimiento con ciertas condiciones impuestas podía conllevar su revocación. Íd., págs. 892-895.

En esa ocasión, resolvimos que el Gobernador podrá ejercitar la clemencia ejecutiva "concediendo el indulto en forma total y absoluta, o en forma condicionada, […] no teniendo otra limitación […] para imponer condiciones que la de que éstas no vayan contra la ley, la moral, o sean imposibles de cumplir". (Citas omitidas). Íd., pág. 893. Añadimos que "[c]uando está sujeto al cumplimiento de una condición subsiguiente, el indulto adquiere plenitud jurídica tan pronto es **aceptado**, pero estando latente la condición, el incumplimiento de ésta lo expone a la revocación". (Énfasis suplido). Íd., págs. 893-894.

En ese momento aclaramos que no estábamos considerando "si la aceptación de un indulto total opera[ba] como una

renuncia del derecho de apelación". Íd., esc. 4, pág. 892. **Ahora bien, resolvimos que en ausencia de precedente judicial no se debía penalizar al confinado "por haber dejado de proseguir su apelación después del indulto" condicional.** (Énfasis nuestro). Íd., pág. 896. Por cuanto, tomamos en consideración las múltiples gestiones previas que el confinado había realizado en la tramitación de su apelación y concluimos que "**aunque equivocado, actuó de buena fe, bajo la creencia de que el indulto concedídole le relevaba de continuar tramitando su apelación en este caso**". (Negritas y subrayado nuestro). Íd. En vista de ello, declaramos *sin lugar* la moción de desestimación presentada por el Fiscal y le otorgamos al confinado un término para perfeccionar su apelación. Íd.

Posteriormente, en el caso Díaz v. Campos, 81 DPR 1009 (1960), nos tocó determinar por primera vez cuál era "el efecto de un perdón incondicional sobre un recurso de *habeas corpus*". Íd., pág. 1015. En resumen, la acusada fue convicta de violar la disposición penal que tipificaba como delito el abrogar por el derrocamiento o destrucción del gobierno, por hechos ocurridos antes de la vigencia de la Constitución de Puerto Rico. Íd., esc. 2, pág. 1010. Así las cosas, la convicta interpuso un recurso de *habeas corpus* ante este Tribunal. Expedimos el auto y autorizamos su libertad bajo fianza. Íd., pág. 1010. Pendiente el recurso de *habeas corpus*, el Gobernador le concedió un **indulto absoluto e incondicional**. Íd., págs.

1011, 1018. Apercibidos de lo anterior, le ordenamos a ésta enviar copia certificada del mismo y a ambas partes que presentaran sus alegatos complementarios discutiendo "la naturaleza del indulto y sus efectos sobre las cuestiones planteadas y la disposición final del caso". Íd., pág. 1011.

En cumplimiento con la orden, la convicta argumentó que el indulto no afectaba en nada la disposición final del caso porque ella no aceptó el mismo y "sin esa aceptación éste no [tenía] validez". Íd. El Ministerio Público sostuvo, por el contrario, que el recurso de *habeas corpus* se tornó académico, pues el mismo tenía el propósito de liberar a una persona que se encontraba bajo custodia ilegal, y, por ende, la convicta, quien se encontraba fuera de la cárcel por haber prestado fianza, luego de la concesión del indulto incondicional, volvió a estar completamente libre tanto *de facto* como *de iure*. Íd.

Una vez sometidos los escritos y documentos solicitados, dispusimos que, en ese caso, el indulto absoluto e incondicional otorgado a la convicta eliminó cualquier limitación a su libertad, por lo cual se tornó académico el recurso de *habeas corpus*. No obstante, la opinión mayoritaria entendió que no debía resolver si el indulto absoluto surtía efecto o no, con la aceptación de la convicta. En detalle, expresamos que:

> [P]or haber cesado la custodia con motivo del perdón absoluto e incondicional que se le otorgó a la peticionaria, no existe restricción alguna de su libertad y que, en consecuencia, procede anular el auto expedido por haberse tornado académico (*moot*) el recurso. […] Si la custodia cesa definitivamente por decisión de aquél que la ejerce, cesa también el poder judicial de determinar sus causas, porque el *habeas corpus* existe para investigar la validez de la detención y no la validez de la libertad.
>
> **Por las razones expuestas, no es posible resolver la cuestión constitucional planteada por la peticionaria en este procedimiento, o si el perdón incondicional otorgádole tenía o no que ser aceptado por ella.** La peticionaria tendrá la oportunidad de hacer esos planteamientos ante el tribunal sentenciador si presenta una moción para anular la sentencia.
>
> Se dictará sentencia anulando el auto expedido por ser académico el recurso y ordenando la cancelación de la fianza. (Énfasis suplido). Íd., págs. 1019-1020.

Por su parte, el Juez Asociado señor Santana Becerra emitió una opinión concurrente y, en lo pertinente, destacó que:

> Existen dos líneas de autoridades en abierto conflicto, las que sostienen que el perdón sólo alcanza el castigo, librando al indultado del cumplimiento de la sentencia y de los efectos legales de la misma, y otras sosteniendo que también alcanza la culpabilidad borrando todo vestigio de la comisión de un delito. **En Emanuelli v. Tribl. de Distrito, 74 DPR 541, 548 [(1953)], nos pronunciamos a tono con una de esas líneas de criterio y dijimos:**
>
> > **El indulto borra para siempre la convicción del delito cometido, quedando de ahí en adelante el indultado tan limpio de ella como si nunca hubiera sido convicto.** (Negritas y subrayado nuestro). Díaz v. Campos, 81 DPR 1009, 1030

(1960)    (Santana    Becerra,    J.,
opinión concurrente).

De otra parte, nuestro Código Penal establece que las
clemencias ejecutivas son causas de extinción de los
pliegos acusatorios como de las penas.   Específicamente,
sus disposiciones catalogan al indulto "u otra acción de
clemencia ejecutiva" como causas de extinción de la acción
penal, así como de la pena.   Arts. 86, 91, Código Penal,
33 LPRA secs. 5131, 5136.   Además, la Regla 64(g) de
Procedimiento Criminal, 34 LPRA Ap. II, R. 64(g), dispone
como   fundamento   para   la   desestimación   del   pliego
acusatorio que el acusado haya sido indultado del delito
que   se   le   imputa.    Sin   embargo,   las   anteriores
disposiciones no establecen claramente cuáles son los
efectos de la concesión o aceptación de éstas.

El   profesor   Ernesto   L.   Chiesa   Aponte   explica   que,
según el Código Penal, "la acción penal se extingue por
indulto" y que ello "incluye cualquier acción de clemencia
ejecutiva".   E. L. Chiesa Aponte, *Derecho procesal penal
de Puerto Rico y Estados Unidos*, Bogotá, Ed. Forum, 1993,
Vol. III, pág. 241.   Añade, que "[e]xtinguida la acción
penal por determinado delito, es necesario desestimar la
acusación o denuncia por ese delito".   Íd.   No obstante,
aclara más adelante que "[u]na vez el acusado es indultado
incondicionalmente   o   en   forma   condicional   sin   que   se
active la condición que daría lugar a la revocación del

indulto, la acción penal o la pena se extingue […]". Íd., pág. 243.

La profesora Olga E. Resumil de Sanfilippo, por su parte, expresa que "cuando el indulto queda limitado a condiciones resolutorias, […] los efectos […] jurídico[s] quedan suspendidos, pudiendo reactivarse los mismos con la revocación del indulto". Resumil de Sanfilippo, *op. cit.*, pág. 211.

Por otro lado, se ha establecido a nivel federal y estatal que, distinto a los indultos absolutos, cuando lo que el gobernante concede es una conmutación de la pena, y la misma es aceptada, persisten los efectos de la sentencia y, consecuentemente, no se extingue el derecho a apelar.[10]

Sintetizando, en cuanto a los efectos de una clemencia ejecutiva, reconocemos la norma que establece que los **indultos absolutos e incondicionales**, una vez concedidos y sin necesidad de su aceptación, absuelven al infractor de todas las consecuencias directas o colaterales; extinguen la acción penal en su contra; son fundamento suficiente para la desestimación del pliego acusatorio; borran la convicción como si nunca hubiera existido; y lo liberan de

---

[10]  Véanse, como ejemplos: 67A CJS Pardon & Parole Secs. 13-14, 17 (actualizado en el 2019); United States v. Buenrostro, 895 F.3d 1160, 1164-1165 (9no Cir. 2018) ("Like a full pardon, a presidential commutation does not overturn the sentence imposed by the sentencing court. It simply 'mitigates or sets aside punishment.'" (citando a Nixon v. United States, 506 US 224, 232 (1993)); Flowers v. State, 236 Ind. 151, 155 (1956) ("Appellant is still held in custody by authority of the judgment herein, which is still final, so that appellant's right to appeal therefrom is not diminished or extinguished by the commutation.").

cualquier castigo. *Ex parte* Garland, *supra*; Emanuelli v. Tribl. de Distrito, *supra*; Díaz v. Campos, *supra*; Arts. 86, 91, Código Penal, 33 LPRA secs. 5131, 5136; Regla 64(g), Procedimiento Criminal, 34 LPRA Ap. II, R. 64(g).

Por el contrario, los **indultos condicionales** adquieren plenitud jurídica, no con la concesión de estos, sino cuando son aceptados por el acusado o convicto. Ahora bien, se mantienen en suspenso los efectos jurídicos de la sentencia mientras se dé fiel cumplimiento a las limitaciones impuestas. De infringirse alguna de éstas, podrá revocarse el indulto y, consecuentemente, reactivarse en su totalidad los efectos de la sentencia dictada. Pueblo v. Albizu, *supra*; Resumil de Sanfilippo, *op. cit.* Por consiguiente, debido a la incertidumbre jurídica en la que se encuentra el indultado sujetado a restricciones, ante la posibilidad de que una actuación desviada reinstale la sentencia con toda su fuerza y vigor, entendemos que no se considerará renunciado con la aceptación su derecho a cuestionar la corrección de la convicción valiéndose de los trámites judiciales a su alcance. Esto, toda vez que la sentencia no ha sido revocada, sino que únicamente se han minimizado y colocado en suspenso sus efectos jurídicos. Pueblo v. Albizu, *supra.*

Distinto a las clemencias ejecutivas discutidas previamente, la concesión o aceptación de una **conmutación de la sentencia**, sea o no condicional, no absuelve al

infractor; tampoco condiciona la absolución al cumplimiento de criterios suspensivos. Más bien, el gobernante, estando en plena vigencia la sentencia, modifica sus efectos para sustituir la pena, o el modo de cumplirla, por uno más benévolo. Es decir, el convicto sigue estando bajo la custodia del Estado como consecuencia del dictamen judicial, lo único que cumpliendo su condena de una manera más humanitaria. Véase Schick v. Reed, *supra*. Por lo tanto, cuando un convicto acepte una conmutación de sentencia de cualquier tipo, dado que los efectos jurídicos de la sentencia siguen vivos —pues sólo se minimizaron algunos de éstos—, igualmente lo estará su derecho a cuestionarla ante los tribunales.[11]

### III

En el caso que nos ocupa, el 22 de diciembre de 2017, el entonces Gobernador le concedió al señor Arlequín Vélez una clemencia ejecutiva cuyo texto transcribimos a continuación:

Indulto Núm. 55-2016

> EL GOBERNADOR DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO, HONORABLE ALEJANDRO J. GARCÍA PADILLA, CONCEDE CLEMENCIA EJECUTIVA EN SU MODALIDAD DE INDULTO CONDICIONAL CON ARRESTO DOMICILIARIO POR EL MÁXIMO DE SU SENTENCIA A EDGARDO ARLEQUÍN VÉLEZ

> POR CUANTO:   En virtud de la sección 4 del Artículo IV de la Constitución del

---

[11] Véanse 67A CJS Pardon & Parole Secs. 13 *et seq.* (actualizado en el 2019); United States v. Buenrostro, *supra*; Flowers v. State, *supra*.

Estado Libre Asociado Puerto Rico, el Gobernador tiene la facultad de suspender la ejecución de sentencias en casos criminales, conceder indultos, conmutar penas y condonar total o parcialmente multas y confiscaciones por delitos cometidos en violación a las leyes de Puerto Rico.

POR CUANTO:   Ante el Tribunal de Primera Instancia, Sala Superior de Ponce, Edgardo Arlequín Vélez fue convicto por infracción al Artículo 4.2(b) de la Ley Núm. 1 del 3 de enero de 2012, según enmendada, conocida como "Ley de Ética Gubernamental" y por infracción al Artículo 135 de la Ley Núm. 146 de 30 de julio de 2012, según enmendada, conocida como "Código Penal del Estado Libre Asociado".

POR CUANTO:   El 17 de diciembre de 2015, Edgardo Arlequín Vélez, fue sentenciado por dicho tribunal a cumplir el término de cuatro (4) años y seis (6) meses de cárcel.

POR CUANTO:   Según surge del informe presentado ante mí, Edgardo Arlequín Vélez se encuentra confinado hace más de un (1) año y merece continuar su rehabilitación fuera de prisión. Además, luego de analizar las circunstancias del caso, se determina que el mismo es meritorio para el ejercicio de la Clemencia Ejecutiva.

POR TANTO:    Yo, Alejandro J. García Padilla, Gobernador del Estado Libre Asociado de Puerto Rico, en virtud de la autoridad que me confiere la Constitución del Estado Libre Asociado de Puerto Rico, por la presente dispongo lo siguiente:

PRIMERO:      Concedo a Edgardo Arlequín Vélez un Indulto Condicional por la condena que le fuera impuesta debido a la comisión de los delitos mencionados.

SEGUNDO:          El **indulto** que por la presente se concede está **sujeto a las siguientes condiciones**:

1. El peticionario no podrá cometer delitos de naturaleza menos grave ni grave.  De ser hallado culpable por delito menos grave o grave, **se revocará este Indulto Condicional.**
2. El peticionario no podrá relacionarse con personas que incurran en actividades delictivas o que ostenten dudosa reputación en la comunidad.
3. **El peticionario permanecerá en su residencia bajo arresto domiciliario (“*Lock Down*”) y monitoreado electrónicamente hasta cumplir el máximo de la sentencia impuesta por el Tribunal de Ponce.**
4. Todas las condiciones aquí impuestas serán supervisadas por la Junta de Libertad Bajo Palabra. **De Edgardo Arlequín Vélez, incumplir con cualquiera de las condiciones aquí impuestas, este indulto quedará revocado.** (Énfasis suplido).[12]

Luego de una evaluación detenida del texto de la clemencia ejecutiva anterior, a la luz del derecho federal y estatal pertinente, nada en el documento sugiere que al exalcalde se le haya otorgado, ni éste aceptado, un indulto absoluto que borrase para siempre su convicción y que dejase su récord sin mácula alguna.  Tampoco se puede deducir que le fue otorgado un indulto condicional.  Al contrario, aunque el Gobernador clasificó la clemencia ejecutiva como un "indulto condicional con arresto domiciliario por el máximo de [la] sentencia", **un análisis**

---

[12] *Escrito solicitando la desestimación del recurso* presentado ante el foro apelativo intermedio, Apéndice, págs. 179-180; Expediente del Tribunal de Apelaciones, Pieza KLAN201600021, Tomo II, *Moción en cumplimiento* del 13 de enero de 2017.

**exhaustivo del mismo nos lleva a razonar que en realidad al exalcalde le fue concedida una conmutación de la pena, condicionada al cumplimiento con ciertas obligaciones.** El Gobernador, en el uso legítimo de su prerrogativa constitucional exclusiva, le confirió al exalcalde una gracia ejecutiva que consistió en sustituir el modo de cumplir la pena, no mediante cárcel, sino a través de arresto domiciliario con monitoreo electrónico. Ello, por el máximo de la sentencia impuesta, a saber, cuatro (4) años por la infracción al Artículo 4.2(b) de la Ley de Ética Gubernamental y seis (6) meses por violar el Artículo 135 del Código Penal.

El efecto práctico de ese documento fue permitirle al exalcalde cumplir el resto de la sentencia impuesta en su hogar, y no en prisión. Ahora bien, el Gobernador condicionó lo anterior a que: (1) no incurriera en actuaciones delictivas, (2) no se relacionara con personas que delinquieran u ostentaran dudosa reputación en la comunidad, y (3) se sometiera a la supervisión de la Junta de Libertad Bajo Palabra. Cualquier incumplimiento con alguna de estas limitaciones conllevaría la revocación de la clemencia ejecutiva.

Es decir, el Gobernador, como la autoridad máxima encargada de ejecutar las leyes, decidió que el bienestar público quedaba mejor servido si el exalcalde, en vez de cumplir tiempo de cárcel, agotaba su sentencia mediante arresto domiciliario. No obstante, esta gracia estaba

condicionada a que el exalcalde mantuviera el comportamiento de un ciudadano obediente de la ley, tanto en realidad como en apariencia.

De manera que, según reseñamos anteriormente, la actuación del Gobernador encuentra amparo en su amplia facultad para conferir clemencias ejecutivas, la cual incluye el poder para otorgar conmutaciones de sentencias condicionales. Además, las limitaciones impuestas fueron legítimas, puesto que no contravinieron las disposiciones constitucionales, no eran inmorales, prohibidas por ley o imposibles de cumplir. Art. II, Sec. 2, Cl. 1, Const. EE. UU., LPRA, Tomo 1; *Ex parte* Wells, *supra*, pág. 314; Art. IV, Sec. 4, Const. PR, LPRA, Tomo 1; Pueblo v. Albizu, *supra.*

En suma, el Gobernador concedió al exalcalde una conmutación de la pena condicional mal intitulada "indulto condicional", que sólo tuvo el efecto de cambiar la forma en que extinguiría la pena. En otras palabras, que éste cumpliera "el máximo de la sentencia impuesta" mediante arresto domiciliario con monitoreo electrónico, sujeto al cumplimiento de ciertas limitaciones. No obstante, pendiente su recurso apelativo, el exalcalde aceptó la conmutación de la pena condicional y continuó litigando su caso ante el foro apelativo intermedio.

Como determinamos previamente, ni la concesión o aceptación de un indulto condicional, y menos de una conmutación de la pena condicional, borran para siempre

los efectos jurídicos de una sentencia. El exalcalde, ante la incertidumbre sobre el alcance de los efectos jurídicos de la clemencia ejecutiva aceptada, prudentemente prosiguió con la impugnación de la corrección de la sentencia mediante el trámite judicial. No haberlo hecho, hubiese sido un proceder "equivocado". Pueblo v. Albizu, *supra*. En vista de lo anterior, actuó correctamente al continuar con el proceso apelativo, dado que su derecho a cuestionar la corrección de la sentencia, luego de aceptada la conmutación de la pena condicional, permanecía tan vivo como la sentencia misma.

### IV

Aclarado que el Tribunal de Apelaciones procedió dentro de su marco de autoridad, nos corresponde entonces determinar si actuó conforme a los límites de una sana discreción judicial. Específicamente, si fue correcta su decisión de sustituir el criterio del Tribunal de Primera Instancia por el suyo y variar el resultado alcanzado inicialmente por el foro primario. En otras palabras, si de un análisis integral de la totalidad de la prueba, es inherentemente imposible o increíble concluir —como lo hizo el foro primario— que se probaron más allá de duda razonable las actuaciones delictivas imputadas al exalcalde.

### A. Apreciación de la prueba en casos criminales

Es principio fundamental de nuestro sistema de derecho que la culpabilidad de un acusado, por estar cobijado por

el derecho a la presunción de inocencia, debe ser establecida más allá de duda razonable. Art. 2, Sec. 11, Const. PR, LPRA, Tomo 1; Regla 110 de Procedimiento Criminal, 34 LPRA Ap. II, R. 110; Pueblo v. Cabán Torres, 117 DPR 645, 652 (1986). El Ministerio Público tendrá la obligación de presentar prueba "suficiente en derecho", es decir, que verse sobre todos los elementos del delito imputado, y satisfactoria, esto es, que "produzca certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo prevenido". (Bastardillas y comillas en el original omitidas). Pueblo v. Cabán Torres, *supra*, pág. 652.

Ahora bien, como hemos expresado, no se puede perder de perspectiva que "nuestro esquema probatorio está revestido por un manto de deferencia hacia las determinaciones que realizan los juzgadores de primera instancia en cuanto a la prueba testifical que se presenta ante ellos". Pueblo v. Toro Martínez, 200 DPR 834, 857 (2018) (citando a Pueblo v. De Jesús Mercado, 188 DPR 467, 477-478 (2013) (*Sentencia*)). Esto se debe a que los juzgadores del foro primario están en mejor posición de escuchar la prueba testifical, observar las expresiones (*i.e.*, lenguaje no verbal o *demeanor*) y adjudicar credibilidad a la misma. Pueblo v. Toro Martínez, *supra*, págs. 857-858; Pueblo v. Cabán Torres, *supra*, págs. 654-655; Ortiz v. Cruz Pabón, 103 DPR 939, 947 (1975). En cambio, los juzgadores a nivel apelativo sólo tienen ante

su consideración "récords mudos e inexpresivos". Ramírez Ferrer v. Conagra Foods PR, 175 DPR 799, 811 (2009).

Es sabido que la apreciación que realiza un juzgador de la prueba desfilada durante un proceso criminal es una "cuestión mixta de hecho y de derecho", puesto que en su análisis se "pone en movimiento, además de la experiencia del juzgador, su conocimiento del Derecho para así llegar a una solución justa de la controversia". Pueblo v. Cabán Torres, *supra*, pág. 653 (citando a Pueblo v. Carrasquillo Carrasquillo, 102 DPR 545, 552 (1974)). Al ser una cuestión mixta, la determinación del juzgador de los hechos en lo concerniente a que la culpabilidad del acusado de delito se probó más allá de duda razonable, será revisable en apelación como una "cuestión de derecho". Pueblo v. Cabán Torres, *supra*, pág. 653 (citando a Pueblo v. Pagán Díaz, 111 DPR 608 (1981); Pueblo v. Serrano Nieves, 93 DPR 56 (1966)). A pesar de ello, es **"norma jurisprudencial trillada que esa 'determinación de culpabilidad' que hace el juzgador de los hechos a nivel de instancia es merecedora de gran deferencia por parte del tribunal apelativo"**. (Énfasis suplido). Pueblo v. Cabán Torres, *supra*, págs. 653-654. Por ello, como regla general, un tribunal revisor no podrá intervenir con la adjudicación de credibilidad atribuida a los testigos, ni sustituir las determinaciones de hechos iniciales por sus propias apreciaciones. Pueblo v. Toro Martínez, *supra*, pág. 858.

Al revisar una determinación relacionada a una condena criminal, debemos tener presente que la apreciación de la prueba corresponde al foro sentenciador. Por lo tanto, como regla general no será alterada, excepto que la apreciación realizada merezca ser revocada porque fue producto de una valoración apasionada, prejuiciada, parcializada o manifiestamente errónea. Igualmente, podrá descartarse la deferencia debida al juzgador de primera instancia sólo cuando un análisis integral de la prueba revele que la apreciación de la evidencia se alejó de la realidad fáctica o que la prueba es inherentemente imposible o increíble, de forma tal que cause en el ánimo del foro revisor una insatisfacción o intranquilidad de conciencia tal que estremezca su sentido básico de justicia. Íd., pág. 858; Pueblo v. Maisonave Rodríguez, 129 DPR 49, 63 (1991); Pueblo v. Cabán Torres, *supra*, pág. 648. Véase, además, L. Rivera Román, *La apreciación de prueba en el Tribunal de Primera Instancia y en el Tribunal de Apelaciones*, en: *Perspectivas en la Práctica Apelativa: 25 años del Tribunal de Apelaciones de Puerto Rico*, San Juan, Ed. SITUM, 2018, págs. 106-107. En ausencia de los fundamentos anteriores, "el tribunal apelativo debe abstenerse de intervenir con la apreciación de la evidencia hecha por el foro recurrido". Pueblo v. Maisonave Rodríguez, *supra*.

Los foros apelativos considerarán que las determinaciones de hechos del foro primario son claramente

erróneas "si de un análisis de la totalidad de la evidencia […] queda[n] convencido[s] de que se cometió un error, como cuando las conclusiones están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida […]". <u>Dávila Nieves v. Meléndez Marín</u>, 187 DPR 750, 772 (2013). **Consecuentemente, si de un análisis de la totalidad de la prueba recibida existe base suficiente que apoya el dictamen, el foro apelativo no deberá "ceder a la tentación dañina de descartar arbitrariamente ni revocar el criterio del foro sentenciador".** (Énfasis suplido). E. Rivera García, *Los criterios de revisión judicial y su aplicación en el sistema acusatorio*, en: *Compendio sobre el sistema acusatorio: experiencias compartidas*, México, 2018, pág. 329. Recordemos que con el fallo de culpabilidad —mediante el cual se entenderán probados los delitos imputados más allá de duda razonable— acaba la presunción de inocencia y nace la presunción de corrección del dictamen. Véase <u>Pueblo v. Prieto Maysonet</u>, 103 DPR 102, 107-108 (1974); Rivera Román, *op. cit.*, págs. 101-102; E. L. Chiesa Aponte, *Derecho procesal penal de Puerto Rico y Estados Unidos*, Bogotá, Ed. Forum, 1992, V. II, págs. 111-112 ("La presunción de inocencia acompaña desde el inicio de la acción penal hasta el fallo o veredicto de culpabilidad. […] [E]n procedimientos post-sentencia para revisar una determinación de culpabilidad, […], ya la

presunción de inocencia ha desaparecido, al ser refutada más allá de duda razonable a juicio del juzgador.").

## B. Delito de acoso sexual

El Artículo 135 (acoso sexual) del Código Penal dispone que:

> Toda persona que[,] en el ámbito de una relación laboral, docente o de prestación de servicios, solicite favores de naturaleza sexual para sí o para un tercero, y sujete las condiciones de trabajo, docencia o servicios a su cumplimiento, o mediante comportamiento sexual provoque una situación con conocimiento de que resultará intimidatoria, hostil o humillante para la víctima, incurrirá en delito menos grave. 33 LPRA sec. 5196.

En particular, este delito tiene dos variantes: *quid pro quo* y ambiente hostil. Primeramente, la modalidad de *quid pro quo* consiste en "solicitar favores de naturaleza sexual para sí o para un tercero y sujetar las condiciones de trabajo, docencia o servicios a su cumplimiento". D. Nevares-Muñiz, *Código Penal de Puerto Rico (Ley 146-2012, según enmendada por la Ley 246-2014)*, San Juan, Ed. Instituto para el Desarrollo del Derecho, 2015, pág. 221.[13] Por su parte, el ambiente hostil se configura cuando, "mediante comportamiento sexual[,] [se provoca] una situación con conocimiento de que resultará intimidante, hostil o humillante para la víctima en el ámbito de una relación laboral, docente o de prestación de servicios". Íd.

---

[13] Véase, además, R. E. Ortega-Vélez, *Hostigamiento sexual en el empleo*, 2da ed., San Juan, Ed. SCISCO, 2005, págs. 10-17, 22-24.

El texto del Artículo 135 fue copiado del derogado Artículo 146 del Código Penal de 2004, el cual introdujo por vez primera este delito a nuestro ordenamiento penal. Nevares-Muñiz, *op. cit.* Del Historial Legislativo de este último surge que la otrora Procuradora de las Mujeres presentó una ponencia recomendando que se tipificara como delito el hostigamiento sexual en el empleo o acoso sexual laboral. A continuación, citamos las partes pertinentes de la referida ponencia:

> Nuestra Constitución en su Carta de Derechos, establece que la dignidad del ser humano es inviolable y que todos somos iguales ante la ley. Claramente expresa que no se podrá establecer discrimen alguno por motivo de […] sexo […].

> El fenómeno del acoso u hostigamiento sexual en la actualidad está causando unos daños irreversibles fundamentalmente en el ámbito de las relaciones laborales, tanto en el sector público como privado.

> .   .   .   .   .   .   .   .

> Actualmente en nuestro sistema de derecho existe legislación que sanciona civilmente este tipo de acción. La Ley Núm. 17 de 22 de abril de 1988[, ] conocida como []Ley para prohibir el hostigamiento sexual en el empleo; imponer responsabilidad y fijar penalidades, impone responsabilidad absoluta al patrono en el campo civil.

> .   .   .   .   .   .   .   .

> **Ante la tendencia creciente de ese fenómeno, hacemos la recomendación de que se incluya este tipo de <u>acto discriminatorio</u> en nuestro Código Penal como delito de acoso sexual laboral. En él se castigará a "los que, mediante acoso sexual, degraden o consientan a que se degrade las condiciones de trabajo de una persona y no cesen o adopten las medidas que eviten el mismo". <u>Este tipo de conducta atenta contra la dignidad y libertad de las personas[,] uno</u>**

**de los preceptos constitucionales que incluye nuestra Constitución. Entendemos que este tipo de acción debe catalogarse como un acto delictivo y no sería suficiente el imponer una multa por el daño causado.**

La sociedad tiene el ineludible objetivo de crear las condiciones para que todas las personas logren la igualdad y la participación plena en la sociedad sin estar sujetas a coacciones o amenazas de tipo alguno que les imposibilite el pleno ejercicio de sus derechos fundamentales[…]. (Énfasis suplido). *Ponencia de la Oficina de la Procuradora de las Mujeres sobre la Resolución del Senado 203 del 1ro de marzo del 2001 para la revisión del Código Penal de Puerto Rico*, del 22 de abril de 2002, págs. 9-10.

La política pública en contra de este tipo de presión o acercamiento sexual no deseado, tanto en la modalidad de *quid pro quo* como de ambiente hostil, es de arraigo constitucional. Tiene como base el imperativo de que la dignidad del ser humano es inviolable y, por consiguiente, es catalogada como una práctica ilegal e indeseable de **discrimen por razón de sexo**. Art. II, Sec. 1, Const. PR, LPRA, Tomo 1.[14]

### C. Código de Ética para servidores públicos de la Rama Ejecutiva y el principio de legalidad

La Ley de Ética Gubernamental de 1985 (Ley de Ética de 1985), 3 LPRA ant. secs. 1851 *et seq.,* y la Ley para crear la Oficina del Panel sobre el Fiscal Especial Independiente, Ley Núm. 2 de 23 de febrero de 1988, según enmendada, 3 LPRA secs. 99h *et seq.,* se crearon en

---

[14] Véase en el ámbito civil, por ejemplo: la Ley de Hostigamiento Sexual en el Empleo, Ley Núm. 17 de 22 de abril de 1988, según enmendada, 29 LPRA sec. 155 et seq.; Velázquez Ortiz v. Mun. de Humacao, 197 DPR 656 (2017); Rodríguez Meléndez v. Sup. Amigo, Inc., 126 DPR 117 (1990).

respuesta al problema de corrupción gubernamental que enfrentaba Puerto Rico para la década de los ochenta. R. Hernández Colón, *Reflexiones sobre la Ley de Ética Gubernamental*, Ethos Gubernamental, Vol. 1, Núm. 1, 2003, pág. 3.

Al analizar la Ley de Ética de 1985, junto a su reglamento, los debates legislativos y su Exposición de Motivos, concluimos que el propósito principal que motivó su creación fue "prevenir y penalizar el comportamiento *delictivo* de aquellos funcionarios y empleados públicos que en el desempeño de sus labores gubernamentales vulneren los **principios básicos de una ética de excelencia**". (Bastardillas en el original y negritas suplidas). OEG v. Cordero, Rivera, 154 DPR 827, 847 (2001).[15] Al mismo tiempo, señalamos que, por este medio, se combatía "**la corrupción en el Gobierno, la conducta**

---

[15] El otrora Juez Asociado del Tribunal Supremo y actual profesor Antonio S. Negrón García afirmó que con la aprobación de este Código de Ética para la Rama Ejecutiva se "eleva[ron] a categoría de virtud pública los criterios de **lealtad institucional, integridad personal**, honestidad, responsabilidad y veracidad". (Énfasis nuestro). A. S. Negrón García, *La ética como resistencia a la corrupción*, Ethos Gubernamental, Vol. 1, Núm. 1, 2003, pág. 19. Añadió que un principio rector de dicho estatuto era "evitar los conflictos de intereses, es decir, que los intereses personales no sustituyan los intereses públicos". Íd. No obstante, reconoció la compleja tarea de identificar los casos de corrupción gubernamental, pues ello requiere "separar finamente la mezcolanza de intereses ocultos para aproximarnos a identificar correctamente sus variadas manifestaciones". Íd., pág. 14. A base de lo anterior, exhortó a los servidores públicos a que:

> [E]n sus funciones, asesoramientos, opiniones y acciones, **se cuiden de no caer en la tentación de justificar el mal, mediante elaboradas conclusiones, cuyos argumentos sean ficticios, carentes de sentido común, y no internalicen los buenos valores éticos. Ello no sólo para evitar su frustración, sino para evitar causar desilusión y cinismo a una ciudadanía que percibe más de lo mismo.** (Énfasis suplido). Íd., pág. 21.

**ilegal** de los empleados públicos, **el abuso de poder** y el **ejercicio de influencias indebidas por parte de los funcionarios de gobierno**". (Bastardillas suprimidas, y negritas y subrayado suplido). Íd., pág. 848. Dispusimos, además, que los funcionarios no podían hacer uso de ventajas indebidas ni de su posición de liderato y poder en la consecución de intereses personales y beneficios "económicos" indebidos. Íd., pág. 851.[16]

Cónsono con esos fines, manifestamos que, debido a la naturaleza que regulaba la Ley de Ética de 1985, es decir, el campo moral y ético, no se podía pretender que se enumeraran instancias específicas que violaran sus disposiciones. OEG v. Cordero, Rivera, *supra*, pág. 845. Destacamos que estábamos frente a un código de ética cuya aspiración era "establecer unas normas de carácter general para guiar la conducta de los funcionarios públicos". Íd.

El entonces Juez Asociado y posterior Juez Presidente de este Tribunal, Hon. Federico Hernández Denton, describió de manera metafórica, pero asertiva, en una opinión de conformidad, la coyuntura histórica que enfrentaba el país y las repercusiones trágicas, tanto a nivel individual como colectivo, de la corrupción de

---

[16] Acorde con lo anterior, el profesor Rafael Hernández Colón resaltó que atajar la corrupción gubernamental requiere de estrategias complementarias porque "la lucha contra la corrupción trasciende la tutela cuidadosa de los caudales públicos". R. Hernández Colón, *Reflexiones sobre la Ley de Ética Gubernamental*, Ethos Gubernamental, Vol. 1, Núm. 1, 2003, pág. 8.

nuestros funcionarios públicos.  En detalle, enunció lo siguiente:

> Puerto Rico se ha visto arropado por telarañas de corrupción gubernamental que parecen saltar a nuestro paso, inesperadas e inexorables, envolviendo en confusión nuestro proceder y deslizándose, macabras, por nuestra piel como las babas del diablo. Ante esta situación tan alarmante que amenaza la legitimidad misma de nuestros líderes electos y la viabilidad de nuestro sistema democrático, se tiene que responder de manera agresiva e implacable. No podemos permitir que se debilite la médula ética de los funcionarios que cimientan nuestro sistema constitucional con su integridad y servicio. Tal descuido podría conllevar una implosión masiva de nuestro ordenamiento democrático. Íd., págs. 867-868 (Hernández Denton, J., opinión de conformidad).

Varios años más tarde, reconocimos que la Ley de Ética de 1985 contenía "disposiciones de carácter **preventivo y profiláctico** que [prohibían] situaciones con gran potencial de ocasionar efectos negativos a la imagen de integridad de los servidores públicos y de imparcialidad de los procesos gubernamentales". (Énfasis nuestro). OEG v. Rodríguez, 159 DPR 98, 123 (2003).  En consonancia con lo anterior, aclaramos que el estatuto procuraba "evitar lesiones mayores de la confianza pública, prohibiendo conductas que de por sí son nocivas". Íd.  Por todo lo anterior, dispusimos que su enfoque alcanza, "no sólo la conducta impropia de los servidores públicos, sino también la apariencia de conducta impropia que éstos puedan exhibir". Íd.

La Asamblea Legislativa, luego de veinticinco (25) años de experiencias y conocimientos adquiridos desde la creación de la Oficina de Ética Gubernamental de Puerto Rico (Oficina de Ética), reformó y, consecuentemente, aprobó la Ley de Ética Gubernamental, Ley Núm. 1-2012, 3 LPRA sec. 1854 *et seq*. Véase Exposición de Motivos, Ley Núm. 1-2012 (2012 (Parte 1) Leyes de Puerto Rico 18).

La Exposición de Motivos señala que la nueva legislación, a través de la Oficina de Ética, busca atender "los retos de un servicio público íntegro, en el que los intereses personales de los servidores no sustituyan los intereses de la ciudadanía". Exposición de Motivos, Ley Núm. 1-2012 (2012 (Parte 1) Leyes de Puerto Rico 18-19). Igualmente, mediante una política preventiva, se persigue "educa[r] en los valores de confiabilidad, bondad, justicia, **civismo**, **respeto** y responsabilidad, que viabilizan la consecución de los más altos niveles de honestidad, rigurosidad y eficiencia en el desempeño de los servidores públicos". (Énfasis suplido). Íd. Asimismo, consignó que, con el fin de atemperar dicha ley a "las necesidades actuales y al recorrido vivencial adquirido", se le confirió a la Oficina de Ética Gubernamental funciones preventivas y fiscalizadoras para, entre otros asuntos, "fiscaliza[r], mediante los mecanismos y los recursos que la ley le provee, la conducta de los servidores públicos[,]

penaliza[r] a todos aquellos que transgreden la normativa ética que integra los valores en el servicio público", "combatir la corrupción y, de surgir nuevas modalidades, aminorar sus efectos". Íd., pág. 19.

El legislador consignó, además, que el "estado de derecho que [crea] este estatuto va dirigido al establecimiento de un Código de [É]tica que reglamenta la conducta de los servidores y [exservidores] públicos de la Rama Ejecutiva". Íd., pág. 19. Con la aprobación de éste, a su vez, se impuso como principio cardinal de la legislación "proscribir las acciones improcedentes que ponen en riesgo la estabilidad del **soporte moral** del Estado". (Énfasis suplido). Íd. Cónsono con esos fines, la Ley de Ética Gubernamental concede a la Oficina de Ética la facultad para referir a varias entidades, entre las que se encuentra el PFEI, aquellos hallazgos que impliquen posibles violaciones a las leyes. Art. 2.3, Ley de Ética Gubernamental, 3 LPRA sec. 1855b.

Al mismo tiempo y de manera similar al estatuto anterior, el Artículo 4.2(b) de Ley de Ética Gubernamental tipificó dentro de sus prohibiciones éticas de carácter general la siguiente:

> **Un servidor público no puede utilizar los deberes y las facultades de su cargo** ni la propiedad o los fondos públicos **para obtener, directa o indirectamente, para él** o para una persona privada o negocio, **cualquier beneficio que no esté permitido por ley.** (Énfasis suplido). 3 LPRA sec. 1857a(b).

Al referirnos a la disposición de la ley anterior que regulaba la misma conducta,[17] indicamos que, para que se configurara una infracción era necesario que se cumplieran los siguientes cuatro (4) requisitos: "(1) que se trate de un funcionario o empleado público, (2) que éste haya utilizado sus deberes, facultades de su cargo, propiedad o fondos públicos, (3) con el *fin* de proporcionarse a sí mismo, a algún miembro de su familia o a otra persona, (4) alguna ventaja, beneficio o privilegio". (Bastardillas en el original). OEG v. Rodríguez, *supra*, pág. 134.

Ahora bien, distinto a la ley anterior, el Artículo 1.2(i) de la Ley de Ética Gubernamental, específicamente, definió el término **beneficio** como "[c]ualquier provecho, utilidad, lucro o ganancia, **sin limitar el término a una ganancia pecuniaria o material**, sino que denota cualquier forma de **ventaja**". (Énfasis suplido). 3 LPRA sec. 1854(i).[18]

---

[17] El Artículo 3.2(c) de la Ley de Ética de 1985 empleaba un lenguaje similar al vigente; a saber:

> Ningún funcionario o empleado público utilizará los deberes y facultades de su cargo ni la propiedad o fondos públicos para obtener, directa o indirectamente para él, para algún miembro de su unidad familiar, ni para cualquier otra persona, negocio o entidad, ventajas, beneficios o privilegios que no estén permitidos por ley. 3 LPRA ant. sec. 1822(c).

[18] De manera ilustrativa, es meritorio reseñar un procedimiento administrativo de otro estado, en el cual se sostuvieron cargos éticos en contra de un funcionario público por utilizar su posición oficial para acosar sexualmente a empleadas subordinadas u obtener de ellas favores sexuales. El tribunal determinó que el estatuto que censuraba que los empleados públicos utilizaran su posición oficial de manera corrupta para obtener o asegurar privilegios o beneficios, mediante actos u omisiones inconsistentes con el desempeño correcto de sus deberes públicos, no se circunscribía a beneficios económicos, sino que también contemplaba utilizar el puesto para acosar sexualmente.

A esos efectos, el Artículo 4.7(a)(1) de la Ley de Ética Gubernamental, establece que cualquier violación intencional al citado Artículo 4.2(b), constituye **un delito grave cuya sanción de naturaleza penal será reclusión por un término fijo de cuatro (4) años, sin beneficio de sentencia suspendida** y con pena de restitución. 3 LPRA sec. 1857f(a)(1).

Advertimos que la Ley de Ética Gubernamental, de ordinario, ha sido analizada por este Tribunal desde el ámbito del Derecho Administrativo, especialmente sobre revisiones de multas administrativas, y en pocas ocasiones desde un enfoque penal, con la profundidad que exige el presente caso.[19] Así, al encontrarnos ante un proceso de naturaleza penal por violación a un estatuto ético de carácter punitivo, tenemos que asegurarnos que el estatuto brinda un aviso adecuado sobre la conducta prohibida y que al acusado se le garantizó un debido proceso de ley. Por ello, procederemos a discutir el principio de legalidad.

El principio de legalidad está contenido en el Artículo 2 del Código Penal, 33 LPRA sec. 5002, que dispone lo siguiente:

> No se instará acción penal contra persona alguna por un hecho que no esté expresamente definido como delito en este Código o mediante ley especial, ni se impondrá pena o

---

Así pues, dicho foro concluyó que el estatuto no era vago y que brindaba notificación adecuada de que la referida conducta estaba prohibida. Véase Garner v. State Comm'n on Ethics, 439 So.2d 894, 896 (Fla.2d DCA 1983).

[19] Véanse, por ejemplo, Pueblo v. Soto Molina, 191 DPR 209 (2014); y Pueblo v. Rodríguez Traverzo, 185 DPR 789 (2012).

medida de seguridad que la ley no establezca con anterioridad a los hechos.

No se podrán crear ni imponer por analogía delitos, penas ni medidas de seguridad. Íd.

Este principio recoge la prohibición constitucional a las leyes ambiguas. Véase, Nevares-Muñiz, *supra*, pág. 2. Conforme a la doctrina constitucional de ambigüedad, la ley o reglamento tiene que establecer adecuadamente cuál es la conducta prohibida, así como la pena a imponerse. Boys and Girls Club v. Srio. de Hacienda, 179 DPR 746, 755 (2010); Pueblo v. APS Healthcare of P.R., 175 DPR 368, 378 (2009). Hemos reiterado que una ley adolece de ambigüedad si:

(1) una persona de inteligencia promedio no queda debidamente advertida del acto u omisión que el estatuto pretende prohibir y penalizar; (2) se presta a la aplicación arbitraria y discriminatoria, y (3) interfiere con el ejercicio de derechos fundamentales garantizados por la Constitución. Pueblo v. APS Healthcare of P.R., *supra*.

Lo anterior no significa que las leyes penales estén exentas de interpretación judicial. Pueblo v. Rivera Rivera, 183 DPR 991, 997 (2011). En materia penal, hemos expresado que la limitación a la facultad interpretativa:

[N]o implica que cada hecho constitutivo de delito deba desprenderse de una simple lectura de la ley, ya que todas las leyes, incluyendo las de índole penal, están sujetas a interpretación. Conforme a ello, ante una duda de qué es lo que constituye delito según determinada disposición penal, el tribunal debe aplicar los principios de hermenéutica correspondientes, lo cual podría resultar en alcanzar una

interpretación restrictiva o extensiva del delito. Pueblo v. Negron Nazario, 191 DPR 720, 739 (2014) (citando a S. Mir Puig, Derecho Penal: Parte general, 8va ed., Buenos Aires-Montevideo, Ed. B de la F. Ltda., 2008, pág. 115 ("[l]a interpretación es lícita, aunque resulte extensiva de delitos o penas"). Véase, además, Pueblo v. Plaza Plaza, 199 DPR 276, 281-285 (2017).[20]

**V**

**A. Prueba testifical y documental**

De los testimonios presentados en el juicio en contra del señor Arlequín Vélez quedaron constatados varios incidentes mediante los cuales el exalcalde acosó a la señora Torres Pérez a través de comentarios implícitos y explícitos de naturaleza sexual que crearon un ambiente laboral hostil, ofensivo y humillante. De igual forma, la prueba en autos confirma que éste utilizó los deberes y facultades de su cargo como primer mandatario municipal y supervisor inmediato de la empleada para intentar obtener un favor sexual no consentido acosándola sexualmente.[21] Ante el rechazo de la señora Torres Pérez a los avances del señor Arlequín Vélez, el exalcalde le impuso una sanción disciplinaria injustificada y llevó a cabo gestiones afirmativas para eliminar su puesto de carrera, mientras intencionalmente creaba con su conducta sexual no

---

[20] Véase también L. E. Chiesa Aponte, *Derecho Penal Sustantivo*, 88 Rev. Jur. UPR 149, 153-154 (2019) ("si la interpretación del tipo delictivo era razonablemente previsible cuando se cometió el hecho delictivo, la interpretación es lícita[,] aunque resulte extensiva de delitos y penas").

[21] Véanse, por ejemplo, *Certificación* (Comisión Estatal de Elecciones), Apéndice, págs. 326-327; Deberes del puesto de *Subdirector(a) de Programas Federales*, Apéndice, págs. 328-330; *Certificación* (Municipio de Guayanilla), Apéndice, págs. 358-370; Amonestación escrita (Municipio de Guayanilla), Apéndice, pág. 356.

bienvenida un ambiente laboral intimidatorio, hostil y humillante para ella.

Por ser patentemente reveladores, procedemos a resumir a continuación los testimonios de la señora Torres Pérez y la señora Vargas Colón, Subdirectora de Recursos Humanos del municipio.

La señora Torres Pérez declaró que fue empleada del municipio desde el 2007. Posteriormente, en el 2013, pasó a ocupar un puesto de carrera como Subdirectora de Programas Federales. Testificó que, en junio de 2013, luego de regresar de un periodo de vacaciones, acudió a la oficina del exalcalde para que le firmara unos documentos. Allí éste le hizo un acercamiento sexual no deseado al solicitarle que le mostrara un tatuaje que ella tenía en su espalda baja.[22] Ésta se negó y cuando se dispuso a salir, el exalcalde intentó impedirlo sujetándola por la blusa, pero ella logró zafarse. Acto seguido, el exalcalde le manifestó que estaba excitado y que tenía su pene erecto. Al ver que ella se marchaba, expresó que se tenía que calmar mientras se colocaba la mano sobre su miembro. La empleada narró los detalles de ese incidente de la siguiente forma:

> P     Antes del mediodía.   ¿Qué fue lo que
> pasó?   Nárrele al Juez.   ¿Qué fue lo que
> pasó?

---

[22] Es importante destacar que la empleada y el exalcalde eran vecinos. Al parecer, durante el incidente el exalcalde le relató que vio su tatuaje mientras ésta abría el portón de su casa. Ella llegó a la conclusión de que él la observó desde un vehículo oficial ("una Yukón color negra").

R    Cuando yo llego a la oficina del alcalde yo encuentro al señor alcalde en… recostado del *counter* de la secretaria. Yo le digo que vengo para que me firme unos documentos y él me dice entonces que entre a la oficina donde está la antesala. Tan pronto él abrió la puerta nosotros entramos. Yo entro primero y él… cuando él va a cerrar[,] cierra con seguro la puerta, a lo que yo le digo que por qué cierra. Entonces él me dice que quiere ver un tatuaje…

.   .   .   .   .   .   .   .

R    Yo entré primero y [el exalcalde] entra detrás de mí y cierra la puerta. Cuando me percato que él cierra la puerta yo le indico que por qué la cierra. Porque la cerró con seguro. A lo que me indica que quiere ver un tatuaje que yo tengo. A lo que yo me niego. Y entonces, él me dice que, pues, se excitó tanto que… que lo tenía para'o.

P   ¿Que tenía para'o qué?

R   Que tenía el bicho para'o. Luego de eso, pues, me pongo bien nerviosa, quiero salir de la oficina, él se… cuando yo voy a tratar de abrir la… la puerta que tiene seguro, él me agarra.
.   .   .   .   .   .   .   .

R   […] Yo logro zafarme para abrir la puerta. Cuando yo me viro él me dice que se tiene que calmar porque al ver que yo voy a salir, pues él se trata de calmar, se pone la mano en el miembro y se sienta en la silla […].

.   .   .   .   .   .   .   .

P   Y usted sale. ¿Cómo usted se sintió en ese momento?

R   Demasiado    nerviosa,    asustada, avergonzada. Salí tan rápido que no saludé a las personas que estaban allí y me fui para mi oficina hasta el Terminal de Carros Públicos.

La empleada narró otro suceso ocurrido en julio de 2013. Expresó que esta vez, el exalcalde recibió un

correo electrónico de la Oficina del Comisionado de Asuntos Municipales (OCAM) para informarle que el Departamento de la Vivienda Federal (HUD, por sus siglas en inglés) ofrecería un seminario en San Juan. Como era costumbre para ese tipo de eventos distantes al municipio, HUD les permitía a los funcionarios hacer reservaciones para pernoctar en hoteles cercanos al área del adiestramiento. Así las cosas, en un momento en que ella acudió a la alcaldía, el exalcalde le **ordenó** que hiciera reservaciones para el seminario y el hotel solamente para él y ella, pero que no quería que su compañera, la Sra. Nelly Sánchez Santos, Coordinadora de Vivienda de Sección 8 de Programas Federales, la acompañara. La empleada se negó porque ese seminario era dirigido a Programas Federales y porque tampoco accedería a acudir sin su compañera, quien siempre la acompañaba a este tipo de actividad. Indicó, además, que "sabía que él quería propasarse" y por esa razón no siguió sus instrucciones e hizo reservación para tres personas. Otro de los eventos descritos por la empleada sucedió la noche del domingo previo a que partieran para el seminario. En esta ocasión, el exalcalde se personó a la residencia de la empleada junto con un participante del Programa de Sección 8 y, **en presencia de sus dos hijos menores de edad,** le dijo con un tono sexual "que bien te ves". Prosiguió a **ordenarle** que lo acompañara al terminal de carros públicos a buscar un vehículo oficial para prestárselo al

inquilino.  Ella se negó y le indicó que, al otro día,

antes de salir para el seminario, haría las gestiones para

prestar el vehículo. Después, el exalcalde le preguntó si

lo recibiría en el cuarto del hotel.  Estas fueron las

palabras específicas, según narradas por la empleada:

> P  ¿Cómo usted se sintió cuando [el exalcalde] le dijo "que bien te ves"?
>
> R  Avergonzada.  Mis niños estaban allí y no lo esperaba en el momento que… que él se atreviera a decir una cosa frente a mis hijos.
>
> P  Anjá
>
> R  Cuando me indica que necesita que yo lo acompañe al Terminal de Carros Públicos donde están mis oficinas de Programas Federales, desde mi casa a las oficinas, para buscar un vehículo oficial para el inquilino […].  Que lo necesitaba para el otro día para ir a una cita en Guayama.
>
> P  Ese inquilino, ¿era inquilino de qué?
>
> R  Del Programa de Sección 8.
>
> .   .   .   .   .   .   .   .
>
> P  […] ¿Y qué usted le contestó, si le contestó algo a él?
>
> R  Que no, que yo no iba a salir.  Que yo hacía las gestiones para prestarle el vehículo de Sección 8 al otro día antes de irme al seminario.
>
> P  ¿Y qué pasó?
>
> R  Entonces, él procede y me indica que si lo iba a recibir en el cuarto del hotel cuando nos fuéramos para el seminario.
>
> P  ¿Qué fue lo que le dijo?  ¿Qué si lo iba a recibir…
>
> .   .   .   .   .   .   .   .

R   Que si lo iba a recibir en el cuarto del hotel.

P   ¿Y qué usted entendió con eso que le dijo?

.   .   .   .   .   .   .   .

R   Que quería tener sexo conmigo.

P   Que quería tener sexo con usted. ¿Y qué usted hizo?

R   Pues, lo dejé allí, me di media vuelta y entré con los nenes a la residencia.

P   ¿Y qué usted hizo con los nenes cuando entró a la residencia?

R   Cuando entramos le pregunté a […] mi nene, que cómo se sentía.   Él bajo la cabeza…

P   Testigo, ¿necesita un receso para reponerse?

FISCAL GARAU DÍAZ:

Juez, yo creo que…

HONORABLE JUEZ:

[…] hasta las tres y treinta.[23]

---

[23]   En el contrainterrogatorio la empleada confirmó que la solicitud del exalcalde para que lo recibiera en el cuarto del hotel la realizó delante de sus dos hijos:

P   […]   Usted le dice al Tribunal de que alegadamente [sic] [el exalcalde] le dijo que si lo iba a esperar en el cuarto del hotel, ¿correcto?

R   Sí, lo dijo.

P   Y eso se lo dijo frente a su hijo[,] según usted dice, ¿verdad que sí?

R   Correcto.

P   Frente a su hijo.

R   Unjó.  Los dos.

P   Que usted entendió que era para tener sexo con usted.

R   Claro.

La empleada indicó que al día siguiente le comentó lo ocurrido a su compañera mientras se dirigían hacia San Juan y le pidió que no la dejase sola en el hotel ni en el seminario. Cuando se registraron en el hotel, solicitaron que la habitación del exalcalde estuviese lejos de las de ellas, porque según expresó: "tenía miedo de que siguiera insistiendo con el acoso que tenía hacia mí". A pesar de lo anterior, indicó que todo transcurrió normal durante el seminario y la estadía. Luego aseveró que, a partir de agosto de 2013, cuando acudía a la alcaldía, "tenía miedo de entrar y estar sola con el alcalde", y le solicitaba a la secretaria de éste que la acompañara, debido a que él continuaba haciéndole comentarios concernientes a su apariencia física. Asimismo, la empleada narró que el 31 de marzo de 2014 el exalcalde la citó a su oficina junto con el conserje de Programas Federales. Ambos entraron y tomaron asiento. El exalcalde le pidió al conserje que saliera de la oficina. Cerró la puerta y se quedó solo con la empleada. Entonces, tras otro intento fallido de acoso, le entregó una amonestación escrita por insubordinación y, segundos después, le manifestó lo bien que se veía. En detalle, la empleada relató el evento como sigue:

> R  […] Cuando llegamos a la oficina del alcalde entramos hasta su oficina. Los dos estamos sentados y el señor alcalde le pide [al conserje] que salga. Cierra la puerta y se queda solo conmigo. Entonces, allí me dice que estoy distante, que él ya me había pedido disculpas por lo que había hecho —que

eso no es cierto, nunca me ha pedido disculpas—

.   .   .   .   .   .   .   .

P  Oiga, que le dijo que había pedido disculpas.

R   Correcto.

P   ¿Y qué usted le contestó?

R   Que él nunca me había pedido disculpas.

P   ¿Disculpas de qué?
R   Por haberme hecho lo del tatuaje y todas las cosas que me hizo posteriores.

P   ¿Qué cosas posteriores?

R   Pues, lo del tatuaje y lo de mi casa en presencia de mis hijos y todas las veces que iba a mi oficina a decirme… que me decía cosas.

P   Entonces, ¿qué sucede después que usted… que usted dice que se quedó sorprendida y le dijo 'usted no me ha pedido ninguna disculpa'? ¿Qué paso?

**R   Pues entonces, él saca un papel y me da una amonestación escrita por insubordinación.**

.   .   .   .   .   .   .   .

P   ¿Y qué usted le contestó, si le contestó algo, cuando recibió esa amonestación?

R   […] que encontré injusto que me diera un memo cuando él me había dicho ya que yo no me iba a encargar de las áreas verdes.
.   .   .   .   .   .   .   .

P  Oiga, en cuanto a sus deberes y funciones. ¿Cuáles son sus deberes y funciones, si alguno, en relación a las áreas verdes?

R   Ninguno.

.   .   .   .   .   .   .   .

P   Oiga, y cuando usted le dijo que era injusto que él le había dado esa instrucción, ¿qué le contestó, si le contestó algo? El alcalde.

**R   Pues, siguió insistiendo que… me cambió el tema y me dice que te ves bien… que ahí fue que me dijo que…**

**P   ¿Cómo fue que le dijo?  ¿Qué se ve bien después que le dio una amonestación?**

**R   Sí, que me veo bien.  Y que entonces, me ve caminando con una blusa azul que me… que ya me conoce porque usaba una blusa azul que me queda bien. […].** (Énfasis suplido).

La señora Torres Pérez entendió que la amonestación escrita era en represalia por no haber accedido al acoso sexual, porque ese era el único memorando que tenía en su expediente. Asimismo, la empleada explicó que después que el señor Arlequín Vélez le entregó la amonestación escrita el 31 de marzo de 2014, comenzaron una serie de irregularidades concernientes a su puesto.  Entre éstas, relató que la señora Vargas Colón le indicó que no aparecían descritos en su expediente sus deberes y responsabilidades.  Posteriormente, en mayo de 2014, la señora Vargas Colón —por instrucciones del exalcalde— le ofreció a la señora Torres Pérez un puesto de confianza como Directora de Programas Federales.  La empleada declinó mediante comunicación escrita y manifestó su intención de permanecer en el puesto de carrera como Subdirectora de Programas Federales.  Expresó que le interesaba continuar en su puesto de carrera porque: "tenía miedo de que al yo aceptar el puesto de confianza

ya que había tantos dimes y diretes con mi puesto, pues, se les hiciera fácil anularlo".

En junio de 2014, la empleada indicó que acudió con la Sra. Nanette Chacón Grau (señora Chacón Grau), Secretaria Administrativa de Programas Federales, a la Oficina de Recursos Humanos y presentó una querella verbal por hostigamiento sexual en contra del exalcalde. Le narró todos los incidentes a la señora Vargas Colón en presencia de la señora Chacón Grau. Luego presentó una querella escrita ante la oficina de Recursos Humanos, donde le hicieron entrega del reglamento de hostigamiento sexual.[24] Días después, la empleada acudió al cuartel de la policía de Guayanilla para presentar una querella por hostigamiento sexual en contra del exalcalde, pero no se la tomaron y la refirieron a la División de Delitos Sexuales en Ponce donde pudo presentarla. Subsiguientemente, la señora Vargas Colón les entregó copias de la minuta de la reunión de junio de 2014 a la empleada y a la señora Chacón Grau, pero omitió hacer constar la expresión del exalcalde donde éste manifestó que tenía el pene erecto.[25] Igualmente, la empleada indicó que luego de haber presentado las querellas nombraron a la señora Vargas Colón como su supervisora inmediata. A

---

[24]   El reglamento de hostigamiento sexual del municipio fue aprobado por el exalcalde el 9 de febrero de 2001 y así consta firmado en el expediente. *Reglamento: Hostigamiento sexual en el empleo*, Apéndice, págs. 383-401.

[25]   La Sra. Nanette Chacón Grau (señora Chacón Grau), confirmó con su testimonio lo relatado por la empleada y la omisión en la minuta.

partir de ese momento, manifestó que la presión en el empleo "[e]ra demasiado fuerte". Enunció que se sentía: "[d]emasiado nerviosa, intimidada, acosada, triste, no podía realizar mi trabajo con la mejor efectividad… por más que yo quisiera no podía hacerlo". Por esa razón, decidió solicitar asistencia de la Corporación del Fondo del Seguro del Estado (CFSE). Estuvo bajo tratamiento en la CFSE hasta enero de 2015, fecha en que se reportó a trabajar nuevamente al municipio. Cuando regresó se había nombrado un Director de Programas Federales. Expresó que luego de reincorporarse no le daban tareas, su día normal de trabajo consistía en estar sentada sin hacer "[p]rácticamente nada".**26**

A preguntas de la defensa, la empleada afirmó que, debido al cúmulo de irregularidades descritas, incluyendo una consulta que realizó el exalcalde sobre la validez de su puesto a la OCAM, le hacían pensar cada vez más que la iban a despedir. Finalmente, destacamos que ésta manifestó que le era imposible renunciar después del primer incidente de acoso sexual porque su sueldo era muy importante para sostener a su núcleo familiar.

A continuación, por su pertinencia, procedemos a resumir el testimonio de la señora Vargas Colón. Entre otros aspectos, surge de su testimonio que ésta enumeró

---

**26** Igualmente, el testimonio de la señora Chacón Grau confirma que, al reintegrarse a sus labores en el municipio, luego del tratamiento en la CFSE, a la empleada "no le estaban dando trabajo[, n]o le daban nada".

las evaluaciones de la empleada, todas con puntuaciones excelentes. Admitió que sólo existía una medida disciplinaria en el referido expediente; la amonestación escrita.[27] Asimismo, aceptó que la consulta a OCAM preguntando si el puesto de Subdirector de Programas Federales debía ser uno de carrera o de confianza la hizo el exalcalde. Ofreció como razón para esa consulta que querían ganar tiempo en lo que encontraban los deberes y funciones que habían desaparecido del expediente de la empleada. No obstante, indicó que no tocó el expediente de personal para ver si de éste surgía algún documento que los desglosara. De igual forma, manifestó que la oferta a la empleada para que dejara el puesto de carrera como Subdirectora de Programas Federales y ocupara el puesto de confianza como Directora de Programas Federales la hizo el exalcalde, por conducto de ella. Así lo explicó:

> R Como en la propuesta de Programas Federales no estaba presupuestad[a] la posición de sub-director y la que estaba presupuestada era la de director de Programas Federales se le ofrece entonces a la señora Lumari Torres…
>
> P Cuando usted dice 'se le ofrece', ¿quién ofrece el puesto?
>
> R Esta servidora. El alcalde me dice, 'dile a Lumari que vuelva a hacer sus funciones de directora'.

Asimismo, la señora Vargas Colón aceptó que luego de haber recibido la querella escrita de la empleada no

---

[27] Las partes estipularon que de la amonestación escrita no surgía texto alguno que apercibiera a la empleada de su derecho a revisar esa determinación del exalcalde.

procedió a realizar una investigación preliminar, según lo requería el reglamento de hostigamiento sexual del municipio. La testigo incurrió en múltiples contradicciones al tratar de justificar las razones por las cuales el puesto de carrera de la empleada, a su juicio, era nulo. De otra parte, ante la posibilidad de que se declarara nulo el puesto de carrera de la empleada, la señora Vargas Colón declaró cuál sería la solución contemplada por el municipio:

> P   Explíquele al Tribunal si conforme a lo que usted pensaba en ese momento… y usted se lo informó al alcalde y dice usted que para ayudar a Lumari se hizo la gestión de OCAM. Explíquele si se declaraba nula la posición de Lumari que estaba ejerciendo a qué posición iba ella a regresar.
>
> .   .   .   .   .   .   .   .
>
> P   […].  A qué posición iba a regresar ella si se anulaba la posición que estaba ocupando.
>
> R   Pues, en todo caso si quedaba nula ella entonces ya el empleo no lo tuviese, pero a ella se le hubiese dado por los años de experiencia y por lo[s] años que lleva en el municipio un puesto transitorio que fue el que ella había ejecutado desde el dos mil dos.

Es decir, la señora Vargas Colón declaró que la alternativa sería despedir a la empleada para luego ofrecerle un puesto transitorio. En otras palabras, sería asignada a una plaza transitoria con un nuevo periodo de prueba sujeto a la aprobación de la autoridad nominadora, es decir, del propio exalcalde. Así lo explicó:

P    Lo que usted le dijo al Tribunal… al compañero Fiscal de que se le hubiera ofrecido un puesto transitorio. Si se hubiera declarado nula la posición que estaba ejerciendo por los años de experiencia se le hubiera ofrecido el puesto transitorio. ¿A qué usted se refiere con eso?

R    Bueno, que si entonces ella se le declaraba nula su posición, obviamente si era nula ella tenía que ser, ¿verdad?, **despedida** porque era nula su posición. Pues entonces, **se le ofrecería… o sea, se le ofrece una plaza transitoria** en un puesto similar al que tenía. (Énfasis suplido).

**B. Discusión**

Tras haber examinado con detenimiento los testimonios anteriores y los restantes que obran en el expediente, resulta obligatorio concluir —como lo hizo el foro sentenciador— que la prueba presentada era suficiente en derecho y satisfactoria para determinar que se cometieron los delitos imputados. El juzgador de primera instancia aquilató la prueba documental, escuchó los testimonios y observó el *demeanor* de los testigos. **Luego de ese proceso meticuloso, halló culpable al exalcalde por violación al Artículo 135 del Código Penal y al Artículo 4.2(b) de la Ley de Ética Gubernamental.** Con esa determinación, el juzgador de los hechos no sólo nos manifiesta que otorgó credibilidad al testimonio de la empleada y a los de aquellos que testificaron a su favor, sino que encontró establecidos más allá de duda razonable los elementos de los delitos imputados. Es decir, dictaminó que, a base de toda la prueba presentada, tenía en su conciencia la

certeza jurídica y convicción moral de que los actos delictivos con toda probabilidad ocurrieron. A esa determinación, los foros apelativos le debemos gran deferencia. Más aún cuando del expediente, como en este caso, no surge una actuación parcializada, apasionada, prejuiciada o manifiestamente errónea por parte del juzgador.

Si bien de la *Sentencia* dictada por el foro primario no surge expresión alguna relacionada a cuál de las dos modalidades de acoso sexual encontró probadas, o si encontró probadas ambas, **la prueba en récord sustenta ampliamente que el exalcalde cometió acoso sexual laboral tanto en la vertiente de *quid pro quo* como de ambiente hostil.[28]**

Respecto a las actuaciones del exalcalde que constituyeron **acoso sexual en la vertiente de *quid pro quo***, no cabe duda de que se probó que éste utilizó las facultades de su cargo para solicitar favores de naturaleza sexual no consentidos a la empleada y presionarla indebida e ilegalmente para que satisficiera los mismos. En una ocasión le ordenó a la empleada que hiciera reservaciones en el hotel solamente para ellos dos y dejara fuera del seminario a su compañera de Programas

---

**28** Aunque el derecho no lo exige, es recomendable que los juzgadores de primera instancia, al emitir sus veredictos de culpabilidad por violación al Artículo 135 del Código Penal, indiquen cuáles de las vertientes de acoso sexual (*quid pro quo*, ambiente hostil o ambas) encontraron probadas. Esta determinación sería de gran beneficio a las partes en el trámite en alzada, a la vez que agilizaría considerablemente la función revisora de los foros apelativos.

Federales, cuyas funciones estaban directamente relacionadas con los temas a tratarse en la actividad. Esa directriz, dada dentro de una relación de poder entre patrono y subalterno, estuvo cargada de una connotación claramente sexual que denota la intención del exalcalde de colocar a la empleada en una situación de vulnerabilidad y así procurarse una ventaja indebida. Valientemente, la empleada incumplió con la orden, pues, según testificó, notó que el exalcalde quería propasarse con ella.

Posteriormente, el señor Arlequín Vélez acudió fuera de horas laborables a la residencia de la empleada y otra vez, ejercitando las facultades de su cargo, le dio instrucciones para que, a altas horas de la noche, le acompañara a buscar un vehículo oficial para un beneficiario del Programa de Sección 8 del municipio. Nuevamente, la empleada declinó obedecer ese mandato. Tras esos incidentes, el exalcalde continuó haciendo comentarios sobre la apariencia física de la empleada.

En otro momento, el exalcalde citó a la señora Torres Pérez a su oficina y procuró quedarse solo con ella para sutilmente presionarla a acceder a sus solicitudes. Ante la negativa de la empleada, esta vez optó por ejercer mayor presión a través de su autoridad disciplinaria e intentó coaccionarla mediante una amonestación escrita por insubordinación. Instantes después, su verdadera intención al entregar la medida disciplinaria quedó develada. Ello, porque, otra vez, dentro de una atmósfera

autoritaria, cargada a su favor y de forma intimidante, volvió a hacerle comentarios a la empleada respecto a su apariencia física y lo bien que se veía. Lo anterior confirma que la razón para tal amonestación escrita no guardaba relación alguna con el desempeño de la empleada, pues, hasta el momento, todas sus evaluaciones habían sido excelentes. De manera que, quedó claramente establecido que la acción disciplinaria en cuestión estuvo impulsada estrictamente por el fin ulterior de intimidarla y de este modo lograr favores sexuales no consentidos.

A la luz de esos incidentes, junto a la consulta a OCAM cuestionando la validez del puesto de Subdirectora de Programas Federales y las constantes presiones laborales, la empleada optó por querellarse en la Oficina de Recursos Humanos municipal y ante la policía estatal. En represalia, el exalcalde utilizó los recursos del municipio con el propósito de afectar las condiciones de trabajo de la empleada e interferir ilegalmente con su interés propietario sobre el puesto de carrera legítimamente creado por éste y autorizado por la Asamblea Municipal.

Como si resultara poco, el récord también refleja que se acreditaron numerosos incidentes de **acoso sexual en la modalidad de ambiente hostil** efectuados por el exalcalde con conocimiento de que no eran del agrado de la empleada. Uno de ellos ocurrió cuando el exalcalde, amparándose en su rol como supervisor inmediato de la señora Torres

Pérez, utilizó como pretexto la visita de ésta a la alcaldía para cumplir con actividades administrativas y la invitó a pasar a su oficina, donde procedió a cerrar la puerta con seguro y a solicitarle que le mostrara un tatuaje que ella tiene en su espalda baja. La señora Torres Pérez se negó y el primer mandatario municipal le indicó que estaba excitado y tenía su pene erecto. Ante ese escenario atemorizante, la empleada logró salir de la oficina, a pesar de que el exalcalde la sujetó y trató de impedírselo. Para ella, esa situación fue intimidante, humillante y vergonzosa.

En otra ocasión, el señor Arlequín Vélez, la noche antes de partir a un seminario de HUD, nuevamente, amparándose en sus facultades como supervisor inmediato de la empleada y escudándose en la supuesta necesidad de tener que prestar propiedad pública (*i.e.*, un vehículo oficial a un beneficiario del Programa de Sección 8), acudió a la residencia de la empleada. En presencia de los hijos menores de edad de la señora Torres Pérez, y con una connotación evidentemente sexual, le dijo que se veía bien y le preguntó si lo recibiría en la habitación del hotel una vez estuvieran destacados en el seminario. La empleada entendió con esas palabras que el exalcalde quería tener relaciones sexuales con ella. Esa situación, con sus hijos como testigos, fue en extremo degradante para la empleada, quien posteriormente expresó temor de estar a solas con el exalcalde.

El acoso sexual desplegado por el exalcalde, además de ser una práctica ilegal e indeseable, constituyó un discrimen por razón de sexo, así como una violación a la integridad y dignidad humana de una mujer trabajadora. Fue un intento ilícito, indecoroso e inmoral de obstaculizar irrazonablemente la labor de la empleada, afectar sus términos y condiciones de empleo, y, en consecuencia, su participación plena en la sociedad.

Precisamente, como ocurre en este caso, cuando es un servidor público el que utiliza los deberes y las facultades de su cargo, con el fin de proporcionarse un beneficio ilegal, tal como lo es un favor sexual no consentido, al acosar sexualmente a otra persona, además de cometer un acto discriminatorio y delictivo, su conducta también configura los elementos necesarios para vulnerar las disposiciones del Artículo 4.2(b) de la Ley de Ética Gubernamental. Esta disposición responde a intereses basados en los principios fundamentales de la ética de excelencia, que son el soporte moral de la función gubernamental y dan legitimidad a nuestras instituciones públicas.

No podemos perder de perspectiva que la Ley de Ética Gubernamental es uno de los ejemplos más evidentes en nuestro ordenamiento jurídico donde el derecho, la moral y la ética se intersecan, para intentar establecer límites a las intenciones en el fuero interno y así disuadir las

**ulteriores actuaciones antiéticas de los servidores públicos.**

Es ampliamente conocido el principio básico de hermenéutica que requiere a los tribunales interpretar las leyes examinando su razón y espíritu, y comparando sus partes de manera integral para dar cumplimiento a la intención legislativa. OEG v. Cordero, Rivera, *supra*, pág. 846 (citando a PNP y PIP v. Rodríguez Estrada, 122 DPR 490, 500 (1988)). Del Historial Legislativo surge que la Ley de Ética Gubernamental está destinada a criminalizar conducta corrupta que incluya la obtención de beneficios indebidos.

El Artículo 4.2(b) aquí en controversia, prohíbe a los funcionarios públicos utilizar los deberes y las facultades de su cargo y la propiedad pública para obtener para sí, o para otro, de manera directa o indirecta, "cualquier beneficio que no esté permitido por ley". 3 LPRA sec. 1857a(b). Surge claramente del Artículo 4.2(b) que el beneficio al que éste se refiere no es a todo tipo de beneficio, sino a aquel que sea ilegal, es decir, contrario a la ley. De igual modo, se sostiene la interpretación anterior al observar el texto del Artículo 1.2(i) que no limita el término "beneficio" estrictamente a cuestiones pecuniarias o económicas, sino que lo define como algún "provecho, utilidad, lucro o ganancia, […] que denot[e] cualquier forma de ventaja". 3 LPRA sec. 1854(i).

En este caso, los actos mediante los que el acusado intentó obtener un provecho, ventaja o beneficio sexual no consentido o bienvenido por la víctima, constituyeron una transgresión del Artículo 135 del Código Penal, lo que a su vez infringió las disposiciones del Artículo 4.2(b) de la Ley de Ética Gubernamental. De este modo, consideramos que el Artículo 4.2(b) no es ambiguo y brinda una notificación razonable sobre la conducta que se prohíbe, pues mediante el sentido común se puede entender que existe un beneficio personal e ilegal en aquellos casos donde un funcionario público -en este caso un alcalde-, utiliza los deberes y facultades de su puesto con el fin de proporcionarse un beneficio ilegal, tal como lo es un favor sexual no consentido, al acosar sexualmente a otra persona. Esta interpretación era una razonablemente previsible, ya que daba una notificación adecuada sobre la conducta prohibida, además que valida y adelanta el propósito del legislador de integrar a la normativa ética los valores de la confiabilidad, civismo y respeto en el servicio público, al mismo tiempo que penaliza a los empleados públicos que la transgreden. Pueblo v. Rivera Rivera, *supra*, pág. 998; Exposición de Motivos, Ley Núm. 1-2012 (2012 (Parte 1) Leyes de Puerto Rico 18-19). Por tanto, concluimos que el Artículo 4.2(b) no contraviene el principio de legalidad.

Ahora bien, al penalizarse esa violación ética con consecuencias de naturaleza penal, el fiscal deberá probar

más allá de duda razonable la "disposición mental corrupta que vaya en busca de un beneficio indebido" y la comisión de los elementos del delito. Asimismo, el acusado gozará durante el proceso de todas las garantías y protecciones del debido proceso de ley. Véase OEG v. Cordero, Rivera, *supra*, págs. 866-867 (Hernández Denton, J., opinión de conformidad).

En el presente caso, se probaron todos esos elementos. El exalcalde disfrutó de un proceso justo e imparcial; no existe duda que al momento de los hechos era un funcionario público electo (el de más alta jerarquía en el Municipio de Guayanilla). Se probó, además, que utilizó los deberes y las facultades de su cargo para intentar obtener un favor sexual no consentido al provocar reuniones ajenas al fin público y realizar múltiples acciones no permitidas por ley, incluyendo discriminar por razón de sexo, acosar sexualmente a la empleada, entre otras acciones descritas. Al mismo tiempo, quedó establecida su **intención criminal y antiética**, y los efectos nocivos en contra de la integridad, la estabilidad de nuestro sistema democrático y la función pública.

Recordemos pues que, los servidores públicos gozamos del privilegio que conlleva ocupar posiciones gubernamentales y, por ello, debemos ejercer nuestras funciones de manera íntegra —más aún cuando se ostentan posiciones de liderazgo— y guardar un gran respeto y lealtad a la fe pública de la que somos custodios. El

abuso de poder, atado a la comisión de actuaciones ilegales, es incompatible con esa responsabilidad y, por ende, no debe ser tolerado.

Por todo lo anterior, es forzoso concluir que el foro apelativo intermedio erró al descartar la deferencia debida a la apreciación de la prueba realizada por el foro sentenciador y revocar su fallo condenatorio relacionado al Artículo 4.2(b) de la Ley de Ética Gubernamental. La prueba que obra en el expediente y el derecho aplicable sostiene en su **totalidad** la convicción y sentencia impuesta al exalcalde.

## VI

Por los fundamentos antes esbozados, modificamos la *Sentencia* emitida por el Tribunal de Apelaciones el 26 de septiembre de 2017, para revocar la determinación que dejó sin efecto el fallo de culpabilidad contra el señor Arlequín Vélez por la infracción al Artículo 4.2(b) de la Ley de Ética Gubernamental, *supra*. Así modificada, se confirma el resto de la *Sentencia* del Tribunal de Apelaciones de conformidad a lo dispuesto en esta *Opinión*.

Se dictará *Sentencia* de conformidad.


ROBERTO FELIBERTI CINTRÓN
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| El Pueblo de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>Edgardo Arlequín Vélez<br><br>Recurrido | CC-2018-305 | *Certiorari* |

SENTENCIA

En San Juan, Puerto Rico, a 9 de marzo de 2020.

Por los fundamentos esbozados en la *Opinión* que antecede, la cual se hace formar parte íntegra de la presente *Sentencia*, modificamos la *Sentencia* emitida por el Tribunal de Apelaciones el 26 de septiembre de 2017, para revocar la determinación que dejó sin efecto el fallo de culpabilidad contra el Sr. Edgardo Arlequín Vélez por la infracción al Artículo 4.2(b) de la Ley Orgánica de la Oficina de Ética Gubernamental de Puerto Rico, 3 LPRA sec. 1857a. Así modificada, se confirma el resto de la *Sentencia* del Tribunal de Apelaciones de conformidad a lo dispuesto en la *Opinión*.

Lo acordó el Tribunal y lo certifica el Secretario del Tribunal Supremo. La Jueza Presidenta Oronoz Rodríguez emitió una Opinión de Conformidad a la que se unieron la Juez Asociada señora Rodríguez Rodríguez y el Juez Asociado señor Colón Pérez. La Jueza Asociada señora Pabón Charneco concurre sin opinión escrita.

José Ignacio Campos Pérez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Peticionario

        v.

Edgardo Arlequín Vélez

    Recurrido

CC-2018-0305

Opinión de Conformidad que emitió la Jueza Presidenta Oronoz Rodríguez a la que se unieron la Juez Asociada señora Rodríguez Rodríguez y el Juez Asociado señor Colón Pérez

En San Juan, Puerto Rico, a 9 de marzo de 2020.

El acoso sexual es una violación a los derechos fundamentales de la persona. Nuestra Constitución declara en la Carta de Derechos que la dignidad del ser humano es inviolable. Art. II, Sec. 1, Const. ELA, LPRA, Tomo 1. Todas las personas son iguales ante la Ley, por lo que cualquier manifestación de discrimen - en este caso por razón de género- es una transgresión de los principios más fundamentales de nuestra convivencia política y social. Es imperativo que reconozcamos la corriente moderna que define el acoso sexual como una manifestación extrema de discriminación y violencia de género, que afecta desproporcionadamente a las mujeres. El hostigamiento

sexual afecta directamente la base de autosuficiencia económica y la capacidad de la mujer para ganarse la vida, ya que la manifestación más extrema de esta conducta, en el lugar de empleo, es la subordinación y el desplazamiento de la persona acosada, privándole de la posibilidad de progresar o permanecer en su plaza.[29]

Hoy más que nunca, es importante que nuestro Poder Judicial visibilice y haga valer los derechos fundamentales de nuestra ciudadanía. Por tal razón, reconocer el discrimen sistémico aún prevaleciente en Puerto Rico, en especial en lo que concierne al discrimen por razón de género, y denunciar sus efectos nocivos sobre nuestras instituciones y la sociedad en general, es un paso en la dirección correcta. Todos los que integramos el sector público del país debemos reafirmar nuestro compromiso con los valores del servicio. Ello implica, sobre todo, que nuestra acción y desempeño se debe dirigir al trato digno, respetuoso y libre de todo discrimen, tanto para nuestros colegas, supervisados y supervisadas o las personas que solicitan los servicios que proveen nuestras instituciones. Toda distinción, exclusión o restricción basada en el género que tenga por objeto o como resultado el menoscabar o anular el reconocimiento y disfrute de los derechos fundamentales de la persona, constituye una forma de discrimen punible en nuestro ordenamiento y no puede ser de otro modo.

---

[29] Naciones Unidas. Consejo Económico y Social. *Informe de la Sra. Radhika Coomaraswamy, Relatora Especial sobre la violencia contra la mujer, con inclusión de sus causas y consecuencias, presentado de conformidad con la resolución 2000/45 de la Comisión de Derechos Humano*, https://studylib.es/doc/7541883/informe-de-la-relatora-especial-sobre-la-violencia-contra (última visita, 27 de febrero de 2020)

Este Tribunal resuelve acertadamente que aceptar una clemencia ejecutiva, en su modalidad de conmutación de la pena, no extingue el derecho del conmutado a apelar la convicción del delito cuya pena fue conmutada ni constituye una renuncia de ese derecho. De igual manera, se resuelve correctamente que en este caso se probó más allá de duda razonable la culpabilidad del Sr. Edgardo Arlequín Vélez por el delito de acoso sexual, según tipificado en el Artículo 135 del Código Penal de Puerto Rico, 33 LPRA sec. 5196. Finalmente, en este caso se configuró una violación intencional del Art. 4.2(b) de la Ley Orgánica de la Oficina de Ética Gubernamental de Puerto Rico (Ley de Ética Gubernamental), 3 LPRA sec. 1857a(b), por las razones que expresa la opinión que emite este Tribunal.

Específicamente, una violación al Art. 4.2(b) de la Ley de Ética Gubernamental, supra, exige establecer que la actuación u omisión del servidor público por la cual se le penaliza constituye un ejercicio de un deber o facultad propio del cargo que ocupa y que se llevó a cabo con el fin de obtener un beneficio no permitido por ley. En atención a lo anterior, este Tribunal correctamente falla a favor de que se configura una violación del Art. 4.2(b) de la Ley de Ética Gubernamental, supra, cuando se establece que un servidor público **utilizó un deber o facultad de su cargo con el fin de obtener un favor sexual no consentido** al acosar sexualmente a una persona.

Maite D. Oronoz Rodríguez
Jueza Presidenta